JOSEPH A. by WOLFE et
al., Plaintiffs,

v.

NEW MEXICO DEPARTMENT OF HU-
MAN SERVICES, et al., Defendants.

Civ. No. 80–0623–JB.

United States District Court,
D. New Mexico.

Jan. 4, 1982.

On Motion For Summary Judgment
Feb. 7, 1983.

Consent Decree Sept. 23, 1983.

348

Marcia Robinson Lowry, George Kannar, ACLUF, New York City, Susan M. Conway and Robert D. Levy, Albuquerque, N.M., for plaintiffs.

Shaffer, Butt, Thornton & Baehr, John A. Klecan, Albuquerque, N.M., Paul G. Bardacke, Atty. Gen. of New Mexico, James W. Catron, Jr., Asst. Atty. Gen., Santa Fe, N.M., for defendants.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, District Judge.

THIS MATTER comes before the Court on the motion of the defendants to dismiss for failure to state a claim. The plaintiffs are children currently in the custody of the New Mexico Department of Human Services (hereinafter "the Department"). They sue through their next friends under 42 U.S.C. § 1983 (1976) for alleged violations of their civil rights. The defendants are the Department and certain state officials employed by the Department. Jurisdiction is proper under 28 U.S.C. § 1343(3) (1976). For the reasons stated below, the motion of the defendants will be granted in part and denied in part.

The statement of the claim contains the following allegations. Homeless, neglected or otherwise dependent New Mexico children are the responsibility of the Department. These children come into the custody of the Department either by consent of the child's parents or through a court order entered after a neglect proceeding. A substantial portion of the Department's funding for the care of these children is from the federal Department of Human Services under Titles IV and XX of the Social Security Act.

The Department's first obligation to these children, under both state and federal guidelines, is to provide assistance to the child's family in hopes of creating a family situation fit for the child. If this cannot be done or if the family is unwilling to have the children, the Department is required to

determine whether the child should be adopted, and if so, to find a new permanent family for the child. There exists no procedure for periodic review of a child's status to determine the child's need for continued foster care, whether to terminate the rights of the child's biological parents and make the child eligible for adoption, or whether to place the child with adoptive parents. Approximately forty percent of the children in the Department's custody are so situated with the consent of their parents.

The plaintiffs allege that hundreds of New Mexico children cannot be returned to their biological families and are in need of permanent homes. It is alleged that the defendants have failed and refused to establish procedures to determine whether children should continue in foster care, whether the rights of the biological parents should be terminated, or whether a child should be placed for adoption. It is also alleged that the Department does not even have an accurate count of the children in their custody.

There is no procedure for development of a permanent plan for the progress of the children to permanent homes. Approximately ten percent of the children surveyed have no permanent plan regarding their status in spite of the duty of the Department to develop such plans for all of the children. Approximately one-third of all of the children in custody have been found to be fit for adoption under the plans developed for them, but most of these children have not yet been freed for adoption. According to the plaintiffs, many of these children are forced to wait for years before the Department takes appropriate action to make them eligible for adoption. The children are frequently moved from one foster home to the next, resulting in emotional disturbances which render the children less likely to be adopted. The average length of time in foster care for children in the Department's custody is nearly five years.

It is alleged that the defendants have a policy and practice of failing and refusing to seek adoptive placements for the children until after they have been freed for adoption, and that the defendants have refused to proceed expeditiously to free them for adoption. Each of the named children plaintiffs are currently in custody and have been determined by the Department to be candidates for adoption, yet appropriate measures to free them for adoption or place them in adoptive homes have not been taken. Several of the children are institutionalized and all have been in Department custody for over three years. All have suffered and continue to suffer mental and emotional distress as a result of the defendants' alleged failures.

From these allegations, the plaintiffs purport to have stated six distinct claims for relief:

1. that they have been denied a state benefit without due process;

2. that they have been deprived of their rights to liberty, privacy and family integrity;

3. that the lack of review of the status of children voluntarily placed in state custody violates their right to due process;

4. that the lack of review of the status of children placed in state custody by court order violates their right to due process;

5. that by failing to seek adoptive homes for children whom the Department has determined to be appropriate for adoption violates the children's rights to liberty and placement in the least restrictive setting; and

6. that these failures of the defendants violate rights the children have under Titles IV and XX of the Social Security Act and related federal regulations.

The prayer for relief seeks to have the action declared a class action, a declaratory judgment declaring the policies of the defendants to be violative of the rights listed above, and preliminary and permanent injunctions against the defendants to keep them from continuing to violate the plaintiffs' rights. In addition, the plaintiffs seek compensatory and punitive damages, costs and attorneys' fees.

The defendants have moved to dismiss the action on a number of grounds. They argue that the allegations recited above fail to state a claim upon which relief can be granted, in that there is no constitutional or statutory right to a permanent, stable adoptive home. They also argue that the Eleventh Amendment bars the claims for compensatory and punitive damages. Finally, they argue that the doctrine of abstention should be applied to this case and that the Court should refuse to accept jurisdiction over the matter.

## I. *Abstention*

■ Because the abstention question is potentially dispositive of the entire cause, that question will be discussed first. The defendants argue that the Court should refuse to involve itself in the operations of State government out of respect for the principles of comity and federalism. The Court finds this argument to be without merit.

The State has failed to make even a *prima facie* showing that the facts of this case are proper for application of any of the abstention doctrines. There are currently three "types" of abstention recognized by the federal courts. *See, Colorado River Conservation District v. United States*, 424 U.S. 800, 813–817, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976). The State has made no attempt to show that this case falls within any of these abstention theories. Therefore, the motion will be denied on this ground.

## II. *The Due Process Claims*

In considering a motion to dismiss under Rule 12(b)(6), the Court follows certain well-established principles. The well-pleaded allegations of the complaint must be taken as true, and all reasonable inferences from the allegations must be entertained in favor of the party opposing the motion. *Lessman v. McCormick*, 591 F.2d 605 (10th Cir.1979); *Mitchell v. King*, 537 F.2d 385 (10th Cir.1976). The motion is a disfavored one, and should be granted only rarely. *Madison v. Purdy*, 410 F.2d 99 (5th Cir.

1969). All doubts are resolved in the pleader's favor. *Parkinson v. California*, 233 F.2d 432 (10th Cir.1956). The motion cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). It is with these principles in mind that the Court will consider the merits of the motions.

The Fourteenth Amendment requires that a State afford due process to an affected person before depriving that person of important property or liberty interest. The defendants make no argument that they have afforded procedural due process to the plaintiffs. Instead, they argue that the plaintiffs have failed to allege the existence of any liberty or property interest which is entitled to the protections of due process.

■ A wide variety of property interests have been recognized as worthy of the safeguards of due process. For instance, public employment may not be denied without due process where a person has "a legitimate claim of entitlement" to such employment. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). A State may not deprive a person of personal property without due process. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corporation*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Further, government may not deprive a person of certain government benefits, once they have been accorded by law, without due process. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ Similarly, the Supreme Court has recognized an array of liberty interests which may not be abridged without due process. In some circumstances, a person's interest in his or her good name receives due process protection. *Perry v.*

*Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). A student cannot be deprived of his State-given right to public education without due process. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The government cannot deprive a prisoner of "good-time" credits, once granted, without due process, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), nor can it revoke the parole of a former prisoner without due process. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

All of the interests listed above have certain things in common. The interests recognized are all created by specific state or federal laws, or they have been found to be implicit in the Constitution because they are "essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

■■■ The supposed property interests alleged by the plaintiffs are said to have been created by both state and federal laws. It is alleged that under the applicable state and federal laws, it is the duty of the defendants to provide certain benefits to the plaintiffs. The Court must give the plaintiffs an opportunity to prove this entitlement. This is true even though it is at this time unclear from the complaint what the dimensions of this entitlement are. Property interests may take many forms. *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Property interests are not created by the Constitution, but rather "are defined by existing rules or understandings that stem from an independent source such as state-law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. Construing the allegations of the complaint liberally, the Court cannot say at this time that the plaintiffs cannot prove any set of facts which would entitle them to relief. *Conley v. Gibson, supra.* Therefore the motion to dismiss the property interest claim must be denied.

The Court reaches the same result on those liberty interests which are alleged by the plaintiffs to arise from state law or federal statutory law. The Court cannot say with certainty that there is no liberty interest created by state law or federal statutory law. The plaintiffs have alleged that such an interest exists, and unless it is manifest that no such interest could exist, a motion to dismiss cannot be granted.

The plaintiffs also claim that a second type of liberty interest is at issue as well. This liberty interest is not a result of state law or federal statutory law. The plaintiffs characterize this interest as one of "leaving state custody and having access to adoptive homes," Plaintiffs' Brief, at 11, and argue that this interest is worthy of due process protection. As the Court understands the argument, this interest arises not from any specific federal or state law, but rather is implicit in the constitutional guarantee of "liberty."

The Supreme Court has discussed constitutional "liberty" many times, but has never attempted to define it with exactness. But the Court has said that "[w]ithout doubt, it denotes not merely freedom from bodily restraint but also the right of an individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The Court has said that "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972).

■■■ The plaintiffs argue that the liberty interest asserted is a part of the protection which the courts have traditionally provided in matters of family. It is

true that the integrity of the family unit is protected by the Constitution. *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1923). Certain matters are so private and so appropriate for resolution within the family itself that the State may not constitutionally interfere in them. *See, Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Further, the concept of family is not limited to the so-called "nuclear" family. *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *cf., Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Quilloin v. Wolcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). From these principles, the plaintiffs argue that they have a liberty interest in access to an adoptive home.

The defendants persuasively argue that what the plaintiffs essentially seek is recognition by this Court of a constitutional right to a permanent, stable adoptive home, and that there is no such right. *See, Child v. Beame,* 412 F.Supp. 593 (S.D.N.Y.1976). The Court agrees that no such right exists. This is not a situation where the State seeks to abridge the rights of a parent in controlling the child's upbringing, *see, Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), to terminate a parent's rights as to a child, *see, Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), or to abridge the rights of foster parents to continued custody of their foster children. *See, Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). These children are wards of the State, and have come into state custody in accordance with state law. The obligations of the State to these children is mostly a matter of State law. While children are "persons" under the Fourteenth Amendment, and are therefore entitled to many of the same constitutional rights as are adults, *see, In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), there is no case law even suggesting that these children are somehow entitled, as a matter of constitutional law, to enjoy the benefits of a foster or adoptive family.

Therefore, the Court believes that this part of the action should be dismissed. Dismissal is appropriate for several reasons. There is no Supreme Court decision suggesting that the Court would recognize the right alleged by the plaintiffs. Furthermore, the plaintiffs still may obtain full relief on the other counts alleged upon proper proof. It is inappropriate for a trial court to recognize vague constitutional theories of relief where there is no appellate precedent in support of the theory and when it is possible to grant relief on more well-recognized theories. Accordingly, the motion to dismiss the due process claim alleged in the second count (Complaint ¶ 52) will be granted.

III. *The Right to the "Least Restrictive Setting"*

The plaintiffs have also brought a count alleging that the defendants have deprived them of their right, as persons in the custody of the State, to be placed in the "least restrictive setting" available. The defendants have submitted no argument on this point. For the reasons stated below, the Court will grant the motion to dismiss this claim.

All of the recent cases which have spoken of this right involved the commitment of mentally ill persons, both children and adults, to state custody. *See, Johnson v. Solomon,* 484 F.Supp. 278 (D.Md.1979); *Rone v. Fireman,* 473 F.Supp. 92 (N.D. Ohio 1979); *Gary W. v. Louisiana,* 437 F.Supp. 1209 (E.D.La.1976). There is no allegation that the children are being treated inhumanely, or that they come into state custody in violation of the right to due process. Rather, the plaintiffs allege that once they are in state custody, they have a right to access to the "least restrictive setting." The Court finds that the rights of

these children, and the duties of the defendants to them, are defined by federal and state statutory law. If the plaintiffs prove that these statutory rights have been abridged, they are entitled to relief. There is no allegation that these statutes are unconstitutional in that they fail to adequately protect the liberty interests of these children. Since the applicable statutes define the rights and obligations of the parties, the Court holds that there is no abstract constitutional right to access to the "least restrictive setting" in these circumstances. Therefore, the motion to dismiss will be granted as to the fifth cause of action alleged in the complaint. (Complaint, ¶ 50.)

### IV. *Social Security Act Claim*

The plaintiffs have alleged claims under Titles IV and XX of the Social Security Act, 42 U.S.C. §§ 601 *et seq.*, and 1397 *et seq.* (1976), respectively. The plaintiffs allege that the defendants have violated these statutes and seek both equitable and monetary relief. The defendants have moved to dismiss for failure to state a claim.

 It is clear that the plaintiffs may obtain injunctive and declaratory relief for violations of Titles IV and XX of the Social Security Act. *Miller v. Youakim,* 562 F.2d 483 (7th Cir.1977), *affirmed,* 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979); *Sockwell v. Maloney,* 431 F.Supp. 1006 (D.Conn.1976), *affirmed,* 554 F.2d 1236 (2d Cir.1977). It is also clear that if the plaintiffs have been denied rights guaranteed by the Social Security Act, monetary relief for this denial is available in an action brought under 42 U.S.C. § 1983 (1976). *See,* 42 U.S.C. § 1988 (1976); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). The motion to dismiss is therefore denied as to this claim.

### V. *Eleventh Amendment Immunity*

 The defendants final argument is that certain of the defendants are immune from liability for damages under the Eleventh Amendment. They concede, as they must, that a suit for injunctive and declaratory relief is proper. *See, Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The plaintiffs concede, as they must, that both the Department and the individual defendants in their official capacities are immune from a suit for damages. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Therefore, to the extent that the complaint purports to state a claim for money damages against the Department and the natural defendants in their official capacities, the motion to dismiss is granted. The claims against the natural defendants in their individual capacities are not barred by the Eleventh Amendment and the motion is therefore denied as to these claims. Finally, it is clear that no suit at law or equity can be maintained against the Department. U.S. Const. amend. XI. Therefore, the motion to dismiss will be granted as to the Department.

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED:

1. That the motion to dismiss for failure to state a claim is granted as to the second and fifth counts alleged in the complaint;

2. That the motion to dismiss is granted in its entirety as to defendant New Mexico Department of Human Services;

3. That the claim for damages against the remaining defendants in their official capacities is dismissed; and

4. That the motion to dismiss is denied as to all other matters.

## ON MOTION FOR SUMMARY JUDGMENT

BURCIAGA, District Judge.

THIS MATTER comes before the Court on the defendants' motion for partial summary judgment on the plaintiffs' claims for damages. Having reviewed the pleadings, memoranda and exhibits submitted by the

parties, the Court finds that the motion is not well taken and should be denied.

The defendants seek to take advantage of the recent change in the law of good faith immunity found in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In that case, the Supreme Court held that when considering a motion for summary judgment based on the good faith defense, a court need not inquire into the subjective good faith of the defendants. The test to be employed is

the objective reasonableness of an official's conduct, as measured by reference to clearly established law. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Id.*, at 818–19, 102 S.Ct. at 2739.

 In this case, the defendants have failed to show the objective reasonableness of their conduct. It is well-settled that a person may not be deprived of a property or liberty interest without due process. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The plaintiffs have introduced evidence indicating that the defendants have deprived the plaintiffs of rights guaranteed by state and federal law in the form of statutes and regulations. Rights granted by federal and state statutes and regulations clearly create constitutionally-protected interests which may not be denied without due process. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, *reh'g denied*, 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972); *Sockwell v. Maloney*, 431 F.Supp. 1006 (D.Conn.1976). It cannot be seriously disputed that if the plaintiffs are entitled to certain benefits under state and/or federal law, and if these benefits have been denied by the defendants, the Due Process Clause is implicated. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

 The defendants have utterly failed to demonstrate that they are entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56. Many of their arguments appear to misunderstand the law. The plaintiffs are not required to show subjective bad faith by the defendants in order to recover. Nor is the plaintiffs' burden to affirmatively show that the defendants were subjectively aware of the law. The plaintiffs need only show that the law is clear. It is presumed that a competent public official is aware of the law governing his conduct. *Harlow, supra*.

Finally, the defendants argue that the statutes and regulations they have allegedly violated vest them with broad discretion. Therefore, they argue, there is no "clearly established law" found in the regulations. This argument is patently frivolous. The plaintiffs have introduced evidence tending to show that the defendants have acted with utter disregard for the controlling statutes and regulations. Even assuming the regulations give broad discretion to the defendants, there is evidence before the Court indicating that they have failed to exercise that discretion and perhaps even abused that discretion. The defendants' argument is without merit.

The Court has fully considered the defendants' motion, and finds it to be poorly-conceived and unfounded. It will therefore be denied.

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that the defendants' motion for partial summary judgment is denied.

## CONSENT DECREE

The Secretary of the New Mexico Human Services Department has acknowledged that children in the custody of the Human Services Department have rights to fair, reasonable and timely decision-making with regard to access to adoption, and to fair, reasonable and adequate procedures and practices necessary to insure access to permanent adoptive homes, as has been deter-

mined by the Court in the previous decisions entered in this case.

This Consent Decree is entered in settlement of Plaintiffs' injunctive and declaratory claims only, and no statement contained herein shall be deemed an admission on any non-injunctive or non-declaratory issue solely by virtue of its having been set forth here. No statement contained in this Consent Decree shall be used to estop the Department or Plaintiffs from seeking relief from or modification of this Consent Decree.

The Court has subject matter and personal jurisdiction over this action and therefore the authority to enter this order.

Plaintiffs and the Secretary of the New Mexico Human Services Department hereby settle the declaratory and injunctive claims of this action, and the court hereby ORDERS that the Plaintiffs and the Secretary and his successors are bound as follows:

## I. *Training*

A. The social services training program shall include a permanency planning component. This permanency planning training may be part of other training provided by the Department or may be provided separately. In either event the training program shall be in writing and shall use state-of-the-art material, including specific information on periodic case review and the legal grounds for termination of parental rights. The trainees shall submit written evaluations of their training program on standardized forms. All written training materials and trainee evaluations shall be provided to the compliance monitor.

B. All child welfare services supervisors and Social Services Division County Office Managers shall receive training in supervision within three (3) months of commencing supervision or employment as County Office Manager, which shall include two (2) days of training in permanency planning. They shall receive at least three and a half days of supervisory training (including permanency planning) each year thereafter. The trainers shall be qualified in the area of permanency planning.

C. As part of their orientation to their job, all new social service caseworkers hired by the Department who will have responsibility for any foster care cases will receive permanency planning training, using state-of-the-art material. If the worker cannot attend a specialized training session within two (2) weeks of placement, permanency planning training shall be provided by the supervisor who has already received the permanency planning training described in Paragraph I (B) above, or by a statewide permanency planning trainer. The individual caseworker permanency planning training must be provided when a new children's services caseworker assumes his/her duties, must last a minimum of two (2) days during which the worker does not have casework duties and shall include specific illustrations as to the use of case records as well as training on relevant legal issues.

D. At least every twelve (12) months all social services caseworkers who have responsibility for any foster care cases shall attend permanency planning workshops for three and one-half (3½) days, specifically to obtain permanency planning training. Such training shall use state-of-the-art written material.

E. The phase-in of training shall be instituted within 120 days of the execution of this consent decree.

F. The Department shall maintain records which contain the names of all caseworkers and supervisors employed by the Department, the dates they were hired, and the dates on which they attended the training referred to in Paragraphs I (A), (B), (C) and (D).

G. All outside trainers shall be selected by the Department, based upon written training proposals submitted by prospective trainers, which proposals shall identify the topics to be covered in the training and the written materials to be used, and which shall give the names and qualifications of all proposed instructors. The annual train-

ing to be provided pursuant to Paragraphs I (B) and (D) shall include training by outside trainers.

## II. *Supervision and Case Loads*

A. Absent documented exigent circumstances, social services caseworkers with responsibility for any foster care cases for whom the permanent plan is return home or adoption or for whom there is no permanent plan shall have a case load of no more than twenty families, with a maximum of thirty-five children in foster care. The Department shall develop and provide to Plaintiffs for comment a reasonable formula for weighing different types of social services cases and shall use such formula to determine the maximum caseload size for mixed caseloads equivalent to the maximum set herein. Any changes in the formula shall be provided to Plaintiffs for comment prior to implementation. All children who enter HSD custody * shall be assigned a social services caseworker.

B. Supervisors shall be responsible for supervising the work of no more than six (6) children's services caseworkers. Five Client Service Agents II equate to one caseworker (to a maximum of 15 Client Service Agents) and two Client Service Agents III or IV equate to one caseworker for the purpose of determining supervisory assignment. In the event that a caseworker leaves, his/her caseload must be reassigned as soon as possible, but no later than two months after the caseworker leaves. During the interim, the caseload shall not be uncovered.

## III. *Planning and Review:*

A. Within a week of a child's entering HSD custody, a case staffing will be held by the social worker and the supervisor and such other persons as they deem desirable.

B. A preliminary planning conference shall be held no more than four (4) weeks after each child enters the custody of HSD. This conference shall be attended by the child's social worker and the supervisor. In addition, where the child enters the custody of HSD by voluntary placement or where the child's parents agree to enter into a consent decree before the preliminary planning conference is held, the child's parents or the care-taking person with whom the child resided prior to entering HSD custody and a legal representative of the parents or care-taking person, if desired, shall be notified of the conference and their participation in the conference shall be facilitated in every way possible.

C. During the preliminary planning conference a preliminary plan for the child, containing timetables, shall be developed, put into writing, signed by the social services caseworker, the supervisor, and, if the child's parents are in attendance and willing to sign, by the child's parents. In addition to containing timetables, this plan shall set forth with specificity the reason for the child's entering HSD custody, whether or not the plan is for the child to be returned to his/her family, the steps necessary to enable the child to be returned home and how long each step should take to accomplish, including visitation schedules, indication of services to be provided to reduce problems that necessitated placement and who will provide and be responsible for monitoring each service provision, precisely what HSD will do to accomplish each step, and the parent's responsibility with regard to each step. This service plan shall be specific rather than general (e.g., "strengthen relationship between parent and child", "work on parent's alcohol problem" is not sufficiently specific to constitute a step); each step should contain a timetable for completion.

D. When a child in the custody of HSD is adjudicated, neglected or abused and there is a hiatus between the adjudication and the dispositional hearing, the child's parents shall be given notice of a conference to be held for the purpose of involving the parent in the development of the treatment plan that HSD will recommend to the court at the dispositional hearing. Paren-

* See paragraph X for definition of HSD custody.

tal participation in the conference shall be facilitated in every way possible. If the parents agree to attend such a conference, it shall be held, if practicable, before service by the Department of the predisposition study required by N.M.S.A. § 32–1–32.1, and shall be attended by the child's social services caseworker, the supervisor, the parents, and the legal representative of the parents if desired. A continuance of the dispositional hearing shall not be required solely on the basis of the availability of the parent(s) to attend a treatment planning conference. If there is no hiatus between the adjudication and the dispositional hearing, the child's parents shall be given notice of a conference to be held for the purpose of the Department's explaining to the parents the treatment plan ordered by the court. Parental involvement in such a conference shall be facilitated in every way possible. If the parents agree to attend such a conference, it shall be held promptly after the dispositional ruling and shall be attended by the child's social services caseworker, the supervisor, the child's parents, and a legal representative of the parents if desired.

E. Whenever by the terms of this consent decree notification to a child's parents is required, the department shall make a record in the case file of written notification to the parents and efforts made to facilitate their participation.

F. Prior to the expiration of a consent decree or dispositional order for a child, but in no event later than six months after the child enters the Department's custody, a permanency plan shall be determined for the child at a meeting attended by the child's social services caseworker, supervisor and social work consultant. The permanency plan shall contain steps, timetables and visitation schedules as set forth in paragraph III (C).

G. Insofar as timetables referenced in III (C) and III (F) provide for actions to be performed by the child's parent or the Department, the party shall begin performance within three months unless that task has a prerequisite set for it in the plan. Other plan timetables shall not be greater than six (6) months and may be extended for one like period only upon documentation by the worker in the case record of the reasons for the extension. The supervisor's approval is also required. Whenever possible, the steps outlined in the service plan shall be taken concurrently.

H. A permanency plan shall be: Return Home (including placement with relatives), Termination/Adoption, Emancipation or Independent Living. Permanency plans of Emancipation or Independent Living shall be limited to children fifteen years or older; provided however that such a plan may be maintained for a child who is twelve years or older, only so long as the child has a documented substantial relationship with his/her natural family and states that he/she does not want to be adopted, and provided that the case is periodically reviewed by the Citizen Review Board.

I. Establishing or maintaining a permanency plan to return the child to the parental home shall depend on frequency of contact, available means of contact, extent of child's relationship to parent(s) and age of child. A plan of return to the parental home shall no longer be pursued if there has been no parental contact during the preceding six months unless special circumstances justifying lack of contact exist. In the case of special circumstances the following shall be established and documented in the record: that the worker has a reasonable expectation there will be return home within eighteen (18) months, that continuation of the plan will be in the child's best interests, that this plan is superior to other available plans, and that the absent parent has reasonably utilized the means of contact available (e.g., phone, mail). Where a case plan of return home is extended pursuant to this Paragraph III (I), the case shall be referred to the Citizen Review Board for immediate review. If a plan of return to the parental home has not been substantially accomplished within eighteen (18) months, it shall no longer be considered a viable plan unless extraordinary circumstances, documented in the case

record by the worker and approved by the supervisor, are present. A permanency plan then must be developed which is an alternative to return to home. This plan will be submitted to the Court at the next periodic judicial review of that child.

J. Any permanency plan may be changed whenever circumstances so require, so long as the necessity for the change is documented in the record. A change in the permanency plan shall be determined in the same manner as an initial permanency plan and pursuant to the provisions of Paragraphs III (F), (G), (H) and (I).

K. When the permanency plan is adoption, such plan shall include specific steps for termination of parental rights. Where possible, voluntary relinquishments shall be obtained. If a relinquishment has not been obtained within four (4) weeks of establishing the plan, the worker shall perform and record the following:

1. Within 45 days after establishing the plan, submit to the attorney representing the Department all necessary information for termination of parental rights on standardized forms. If the worker has reason to believe a relinquishment will not be obtained, (s)he shall make an earlier referral.

2. Within 15 days of submitting to the attorney, the worker shall contact the attorney to discuss the status of the case, to determine if any additional information is needed, and to set and put in writing a reasonable timetable for obtaining necessary information, for filing the petition and for requesting a hearing date.

3. If no petition for termination of parental rights has been filed within the time set pursuant to Paragraph III K(2), or if the attorney and the worker fail to reach agreement on a timetable within 15 days of the worker's contacting the attorney pursuant to Paragraph III K(2), or if there is disagreement between the worker and attorney on grounds for termination, then the supervisor shall immediately contact the County Office Manager for mediation and shall simultaneously contact the De-

partment's Legal Services Bureau. The County Office Manager shall have ten (10) days in which to resolve the matter through local mediation, and shall use the resources of the Legal Services Bureau, if necessary, to do so. If mediation has not resolved the matter at the end of ten days, the general counsel shall make a final decision on the issues presented within ten (10) days thereafter.

4. If the court dismisses the application to terminate parental rights, the attorney and the worker will meet with the child's guardian ad litem to determine whether an appeal should be taken or other relief sought from the court's decision. If the tentative decision between the worker and the attorney is not to appeal, the meeting shall include the worker's supervisor. This meeting will be held promptly after entry of written order or judgment. If the worker and/or the supervisor desire to seek relief from the decision and the attorney representing the Department does not, a meeting shall be held with the Social Services Division director. The Social Services Division director in consultation with the Department's General Counsel shall make the final decision concerning the appeal.

L. As soon as a permanency plan of adoption is established the Central Adoptions Unit shall be notified and provided with pertinent information on the child. The Central Adoptions Unit will begin examining available adoptive families for a possible match with the child upon receipt of this notice. If it appears likely that termination will be granted by default, the child may be placed immediately.

M. In all cases where parental rights are terminated by the court or through voluntary relinquishment, the Citizen Review Board for Substitute Care will provide periodic review of the child's situation. This review shall occur at least semi-annually, according to the facts in a given case, but may occur more often at the determination of the Citizen Review Board or the worker. The Department will also request the court granting any termination petition to require periodic judicial review of the

child's case until a petition for adoption is filed. Simultaneously, the Department will pursue modification of the Children's Code to maintain periodic judicial review in the interim between relinquishment or termination of parental rights and the filing of a petition for adoption.

N. The Department shall maintain aggregate records on each child in its custody as specified in Paragraph VII.

O. All information that the Department is required to submit to the court pursuant to state statutes regarding periodic judicial review and predisposition reports on adjudicated, neglected children shall be submitted on a standardized form developed by the Department within sixty days after entry of this judgment.

P. So long as Section 32-1-38.1 of the New Mexico Statutes remains in effect, the Department shall comply with it in a timely fashion in each instance. All parties with an interest in the child at issue, including natural parents and including foster parents who have had care of the child for a continuous period of six months or more and including the Citizen Review Board, shall receive adequate written notice of the proceedings. The Department shall not object to the participation of any of the above-named persons at these proceedings.

Q. In the event that Section 32-1-38.1 N.M.S.A. is substantially amended, the portion of this consent judgment concerning periodic external judicial review may be renegotiated. In the event that the parties cannot reach an agreement, the issue may be submitted to the court.

IV. *Adoption Matching*

A. Within five (5) days of execution of a relinquishment of parental rights or entry of a decree of termination of parental rights the child's complete record will be submitted to the Central Adoption Unit for review to determine completeness and any further documents needed.

B. Social workers who perform adoption matching shall have a degree in social work plus three years' experience as

a child welfare worker or supervisor, or shall have five years' experience in that field.

C. The Central Adoption Unit shall send at least one, and whenever possible three, home studies of appropriate prospective adoptive families to the child's worker. These studies shall be sent normally within ten working days but in no event later than thirty calendar days after receipt of the material on the child. If specific and identifiable facts related to this child's special needs documented in the record, require special adoptive family recruitment efforts, an additional thirty days may be taken to submit home studies to the worker. If no home study of a prospective adoptive family is available as a result of these efforts, specific adoptive family recruitment measures shall be undertaken, as described in Paragraph IV (E) below.

D. Within ten (10) working days after each new family is approved as an adoptive family, that family shall be specifically evaluated as to suitability for any child not in an adoptive home placement or in the process of being matched with a specific family, and a record of this effort shall be entered in the family's file.

E. If no home studies are sent to the local social services caseworker, or no initial family-child matching decision has been made within sixty (60) working days after the material on the child is submitted to the Central Adoptions Unit, specific adoptive family recruitment efforts in conformity with nationally recognized adoption recruitment techniques, including utilization of specialized adoption agencies and adoption exchanges, shall be undertaken immediately by the Central Adoptions Unit. The Central Adoptions Unit shall establish and continue to maintain a specific recruitment plan to identify families for children described in this paragraph. Such efforts will be documented in writing.

F. A list of specialized agencies and adoption exchanges shall be developed and maintained by HSD. This list shall contain a chronology of each referral to the agency or exchange.

G. The Department shall develop in writing within sixty days of entry of the decree a specific adoption recruitment plan, statewide, containing specific goals, planned actions, detailed steps for implementation and timetables, and developed in accordance with the needs of the New Mexico children who are the Department's responsibility. Twelve months thereafter and at twelve month intervals the Department shall reassess the recruitment plan in light of the children currently in need of adoptive placement as well as the effectiveness of the previous year's recruitment efforts and shall make any necessary modifications in the plan for the next twelve month period.

H. All caseworkers with responsibility for adoptive recruitment or matching shall receive a minimum of two (2) days' training in recruitment and matching procedures and home studies, which training will be given before the worker begins adoptive home recruitment or matching. State-of-the-art written materials shall be provided. Such training may be provided by a person who has received a minimum of two (2) days' training in state-of-the-art adoptive recruitment, screening, matching and placement policies and procedures.

V. *Adoption Screening and Placement*

A. All home studies undertaken by the Department shall be completed no later than four (4) months after the family initially contacts the adoption social worker. The priority for conducting home studies shall be based upon the special needs of children currently available for adoption.

B. Home studies shall be conducted only by adoption caseworkers who have received a minimum of two (2) days of specialized training, during which caseworkers shall have no casework duties. This training shall use state-of-the-art materials.

C. Adoptive home studies shall be conducted in accordance with state-of-the-art adoption screening procedures and shall include separate personal interviews by the adoption worker with at least two of the references listed by the applicants and individual interviews with each applicant separately. The Department shall obtain a psychological evaluation of prospective adoptive parents in those instances in which the worker believes that an evaluation would be beneficial to help determine the appropriateness of placing a special needs child with that family.

D. Post placement services, including psychological evaluation or treatment, shall be provided at the expense of the Department prior to the entry of a judgment of adoption for each special needs child. The Department shall provide such services after entry of a judgment of adoption, regardless whether the adoption is subsidized, where the parents of a special needs child so request and the worker believes there is a risk that the adoptive parents may relinquish the child.

E. Where the adoptive placement of any child has been disrupted, the Department shall obtain a written psychological evaluation of the child to determine, among other matters, the child's need for treatment. If treatment is recommended, the Department shall provide it unless the worker believes it is unnecessary, in which case the matter shall immediately be referred to the Social Worker Consultant for resolution within two weeks. The Social Worker Consultant shall have the authority to seek further psychological and/or psychiatric evaluation of the child and/or consult with other psychologists and/or psychiatrists as (s)he deems appropriate.

F. Every effort shall be made to place in a new adoptive home, as quickly as practicable, a child whose adoptive placement has been disrupted, unless the caseworker, taking into consideration the child's psychological evaluations, determines that such placement should be delayed and sets forth in writing the basis for such delay.

G. Written notification of the availability of services referred to in Paragraphs V (D), (E), and (F) and of the subsidized adoptions program shall be provided by the worker to all prospective adoptive parents.

The date on which the parents were given this notification shall be recorded in their file. One copy of the form for this notice shall be provided to Plaintiffs.

H. If the Department contracts with other agencies to provide the adoptive screening, matching or placement services, it shall, consistent with existing contract obligations, require such other agencies to comply with the applicable provisions of Paragraphs IV and V of this judgment.

## VI. *Legal Services*

A. The Department, the children in its care and the children for whom the Department is responsible have the right to quality legal services necessary to carry out the provisions of this decree and state law. The Department will use its best efforts to obtain those services. The Department commits to seeking legislation in the Thirty-Sixth Legislature, Second Session, to appropriate public monies to allow the Department to provide this legal representation directly, either through its own employees or through contract. The Department will also seek legislation amending state law to make it clear that any attorneys prosecuting terminations of parental rights, child abuse and neglect cases, voluntary placement actions and periodic court reviews represent the Department in those actions and must respond to the wishes and direction of the Department as would any other attorney in a professional relationship. The Department will use its best efforts to do everything necessary to ensure the enactment of this legislation. If the legislation is not enacted, the parties will meet within one month of the end of the legislative session to renegotiate the issue of providing legal services to the Department. If the parties cannot reach an agreement on this point, the issue will be submitted to the Court for trial.

B. Attorneys representing the Department in termination cases shall not unreasonably delay the prosecution of petitions. Except in exigent circumstances, a reasonable time for filing of the petition to terminate parental rights shall not exceed thirty days from the submission to the attorney of the necessary information.

C. A coordinated plan of legal services shall be developed by the Department within 90 days following the effective date of this consent decree. The plan shall designate an HSD attorney with specific responsibility for coordinating with the District Attorneys and ensuring that ongoing training on periodic review and termination of parental rights is offered to District Attorneys. The plan also shall provide that the District Attorney in each judicial district shall designate by name the attorney(s) in each county to provide legal services to each HSD social services office. Except as otherwise directed by the Department, the District Attorney and his designee shall have responsibility for filing and proceeding with all petitions for HSD custody of children and termination of parental rights. Without limitation, the plan will contain procedures to hear and resolve workers' complaints about inadequate legal services, including unreasonable delays in the prosecution of the petitions.

D. The Department, by means of a blue ribbon task force on which the Plaintiffs will be represented, shall evaluate in writing, within twelve months of the entry of this judgment, the quality of legal services provided to it. The Department shall take all measures necessary to ensure high quality legal services.

## VII. *Information and Records System*

A. The Department shall have on line statewide by the end of March 1984 a computerized information system which will include the following elements: the name of the child, the date the child entered HSD custody, the child's birth date, the basis for legal custody, the date legal custody was obtained, the date of each judicial review, the date of entry in the child's record of a permanent plan and what the plan is, the number and dates of parental contacts with the child, a record of each change in placement and worker, the date of discharge from HSD custody, and the nature of the discharge. If a child enters HSD custody more than once, this data will be maintained for each entry.

When applicable, the data shall also be maintained on the date the child was re-

ferred to an attorney for termination of parental rights, the date a termination petition was filed, the date parental rights were terminated or relinquished, the location and status of the child following termination or relinquishment until emancipation or adoption, the date the child was referred to the Central Adoptions Unit, the date the child was placed in the adoptive home, and the date on which the child was legally adopted.

B. In addition, all of the dates and actions required by this consent decree shall be recorded for all children in HSD custody beginning no later than sixty (60) days after the effective date of this consent decree. All information required to be maintained by this consent decree shall be maintained in computerized or manual form and shall be recorded in each case record on statewide standardized forms.

C. Failure of the Department to have the computerized information system completely on line state wide by the due date will not be deemed by itself to constitute substantial non-compliance with the consent decree until July 31, 1984; however, such failure shall result in the Department's being required to provide quarterly reports to the compliance monitor for two quarters beyond the requirements of Paragraph XII.

VIII. *Staff Salaries and Qualifications*

A. All child welfare services caseworkers hired after the effective date of this decree shall have at least a bachelor's degree in social work or a related field plus verifiable social work experience totalling one year. A master's degree in social work may be substituted for the required experience. If, during the six month probationary period provided by the State Personnel Act, a social worker violates the terms of this consent decree on matters within the worker's control, that violation must be reported in writing to the director of the Social Services Division and considered in making the decision of whether to retain the worker.

B. All child welfare services supervisors hired after the effective date of this consent decree shall have at least a bachelor's degree in social work or related field plus any combination of graduate education in social work or related fields and/or verifiable social work experience totalling three (3) years.

C. The social work consultant shall have at least a master's degree in social work plus any combination of postgraduate education in social work and verifiable experience totalling three (3) years. Within one year of being hired the social work consultant will be provided a total of two (2) weeks of specialized training in nationally recognized permanency planning training programs.

D. Current HSD personnel may be "grand-parented" so as to qualify for their current position if they receive the training required by this consent decree, but advancement by a current employee after the effective date of this decree to the position of supervisor or social work consultant shall not be "grand-parented". The Department will provide to Plaintiffs for comment its career ladder proposal currently being developed.

IX. *Citizen Review Boards for Substitute Care:*

All references in this consent decree to Citizen Review Boards refer to the project currently being established under the aegis of the Planning and Evaluation Bureau, Administrative Services Division of the Human Services Department. Within six months of entry of the decree, an outside contractor will establish and operate local Citizen Review Boards in various parts of the state. In every instance where case referral is required by this consent decree, the worker will make the referral within two weeks after the occurrence necessitating the referral. Referral will be made to that local review board in closest proximity to the case in question. Citizen Review Boards will have the authority and responsibility to review the case plans for children in substitute care, and to report their findings and recommendations to the Department and to the children's court. The department will give such boards reasonable access to the children's case files. If Citi-

zen Review Boards should, for whatever reason, cease to operate prior to the expiration of this consent judgment, the portions of this judgment providing for referral to Citizen Review Boards shall be renegotiated to provide for an alternative review mechanism. If the parties cannot reach agreement upon the nature of the review mechanism, the issue may be submitted to the court.

## X. *Definitions*

For purposes of this consent decree, the following terms are defined:

*Social services caseworkers:* social workers who are assigned child welfare cases.

*In the custody of HSD:* in the physical custody and/or legal custody of HSD; includes children in the physical but not the legal custody of HSD, children who are in the legal custody of HSD but in the physical custody of another person or agency, and children who are in the legal custody of HSD who have been returned home from foster care on a temporary or tentative basis. Children placed with the Department of Health and Environment are not "in the custody of HSD" during such placement.

*Voluntary relinquishment:* any lawful written voluntary permanent surrender of parental rights, whether denominated a relinquishment of parental rights or a consent to adoption.

*Parent:* parents, guardians and custodians as defined in the Children's Code.

*State-of-the-art:* program standards recognized by such professional organizations as the American Public Welfare Association and the Child Welfare League of America.

*Effective date of this consent decree:* sixty (60) days following the date on which this document is adopted by the Court or otherwise approved by it as part of a judgment or order.

## XI. *Compliance Monitor/Enforcement:*

A. In order to monitor compliance with the terms of this judgment the Department shall enter into a contract with a compliance monitor. The compliance monitor shall be selected jointly by Defendants and attorneys for Plaintiffs. The terms of the contract shall be agreed upon by Defendants and attorneys for Plaintiffs. A compliance monitor shall serve, in accordance with the terms of the contract, for the duration of the decree.

B. Defendants shall provide to the compliance monitor all information necessary to fulfill the compliance monitor's obligations. The compliance monitor shall provide to Plaintiffs' attorneys all documents and reports deemed necessary by Plaintiffs to determine whether Defendants are meeting all of the provisions of this judgment. The Department shall provide information to the monitor on a quarterly basis unless the reporting requirements are changed pursuant to Paragraph XII. In the event that Plaintiffs request the underlying data upon which the compliance monitor has based any report, that data shall be provided.

C. Plaintiffs shall have access to any records maintained by the Department that are necessary to determine whether Defendants are in compliance with this decree. Such access is limited to exclude data available to Plaintiffs from the compliance monitor. Access shall be provided at reasonable intervals and at mutually convenient times.

D. In the event that the Department is out of compliance with any of the terms of this judgment, Plaintiffs shall so notify the Department.

E. Within fifteen days after the receipt of this notification, the Department shall respond to Plaintiffs in writing, disputing Plaintiffs' claim of non-compliance and/or setting forth in writing the reasons for non-compliance and the steps, including time frames, by which compliance will be reached.

F. Plaintiffs shall respond to the Department's submission within fifteen days of receipt by either written acceptance or rejection of the Department's dispute of Plaintiffs' claim or plan for compliance. In the event that Plaintiffs do not accept the

Department's plan, there shall be an additional thirty days during which the parties agree to extend their best efforts to resolve this disagreement. If agreement is not reached, the parties agree to submit the matter to the court for resolution.

G. The Department agrees that all children for whom the Department is substantially out of compliance with regard to the provisions set forth in this decree shall be referred to a local Citizen's Review Board.

H. All documents and information received on the monitoring of this agreement shall be confidential except insofar as necessary to be used for monitoring or enforcing this judgment.

I. Plaintiffs will not move for contempt without first pursuing the steps set forth in Paragraphs XI (D), (E) and (F).

## XII. *Duration:*

A. This judgment shall remain in force and effect and the court shall have continuing jurisdiction to enforce its terms for five years from the date of entry unless extended for an additional period pursuant to the provisions of Paragraphs XII (E) or (F).

B. If at any time after the expiration of two years from the date of entry of this judgment the Department is in substantial compliance with its terms, the quarterly reports required pursuant to Paragraph XI (B) will be required only semi-annually for an additional period of one year.

C. If the Department remains in substantial compliance for one year after semi-annual reporting commences, the Department shall no longer be obligated to provide reports to Plaintiffs at its own expense. Plaintiffs shall have the right to obtain and pay for semi-annual reports and other information and documents pursuant to Paragraphs XI (B) and (C) for an additional period of two years or the expiration of the judgment, whichever is sooner.

D. If at any time the Department does not remain in substantial compliance with this judgment, quarterly reporting at the Department's expense will resume until substantial compliance has been obtained, after which the timetables set forth in Paragraph XII (C) will be reinstituted.

E. This judgment will expire at the end of the two year period referred to in Paragraph XII (C) if the Department has remained in substantial compliance with the judgment continuously for the preceding twelve months. If the Department has not been in substantial compliance for that period, this judgment shall be extended for one further year, or until such time as the Department has been in substantial compliance with its terms for a continuous period of twelve months, whichever is sooner.

F. Plaintiffs shall have the right to seek an extension of this decree from the court as otherwise permitted by law.

## XIV. *Named Plaintiffs*

The Department will immediately assign the supervision of the cases of all the named Plaintiffs to the direct day-to-day control of the director of the Social Services Division. The Department, in consultation with Plaintiffs and their experts, shall develop detailed written treatment plans for all named Plaintiffs in the Department's custody and shall provide, at the Department's expense, all necessary services for as long as needed. The Department shall supply written status reports concerning all named Plaintiffs to Plaintiffs' counsel semi-annually so long as named Plaintiffs remain in the Department's custody, and shall respond to all reasonable requests for additional information. In the event that Plaintiffs' counsel determine that additional or different services or treatment are necessary for any named Plaintiff, Defendants agree to meet with Plaintiffs' counsel and use their best efforts to arrive at agreement.

## XV. *Change in Law*

If a change in law makes impossible compliance with any part of this decree, Defendants shall be relieved from performance to the extent that such compliance is impossible until otherwise agreed to by the parties or ordered by the Court. Defendants shall inform Plaintiffs as soon as practicable of any change or anticipated change in law which has such effect. The parties

agree to discuss appropriate modifications to this decree to accommodate this decree to such change(s), and in the event that no such modification is agreed to, either party may bring this matter before the Court.

XVI. *Costs of Monitoring*

A. The parties hereby stipulate that the reasonable time needed by the attorneys for Plaintiffs to perform their duties and obligations during the duration of this decree, assuming substantial compliance by Defendants, is 1,190 hours.

B. The parties hereby stipulate that the cost of contracting with the compliance monitor will not exceed $20,000 per year. The expense of the compliance monitor shall be taxed as costs against the Defendants.

IT IS SO ORDERED.