ARTIST M., et al., Plaintiffs,

v.

Gordon JOHNSON, et al., Defendants.

No. 88 C10503.

United States District Court,
N.D. Illinois, E.D.

Nov. 21, 1989.

Patrick Murphy, Julie L. Biehl, Susan Tone Pierce, and Michael G. Dsida, Office of the Public Guardian, Chicago, Ill., for plaintiffs.

Susan Getzendanner, Christina Tchen, Charles Smith, Sp. States Attys., Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

In December 1988 plaintiffs filed this action as a class action seeking declaratory and injunctive relief pursuant to the Adoption Assistance and Child Welfare Act of 1980 ("AAA"), 42 U.S.C. §§ 620–629, 670–679—either under 42 U.S.C. § 1983 ("Section 1983") or perhaps via direct action—and under the Due Process Clause. Plaintiffs simultaneously filed a Motion for Preliminary Injunction and a Motion for Class Certification.

Upon presentation of plaintiffs' motions, defendants concurred in the propriety of certifying two classes of plaintiffs:

Class A: Children who are or will be the subjects of neglect, dependency or abuse petitions filed in the Circuit Court of Cook County, Juvenile Division ("Juvenile Court"), who are or will be in the custody of Department of Children and Family Services ("DCFS") or in a home under DCFS supervision by an order of Juvenile Court and who are now or will be without a DCFS caseworker for a significant period of time.

Class B: Children who are or will be the subjects of neglect, dependency or abuse petitions filed in Juvenile Court who are or will be placed in DCFS' custody and who are or will be without a DCFS caseworker for a significant period of time.

This Court entered a memorandum order certifying both classes, granting plaintiffs' request for expedited discovery and setting plaintiffs' Motion for Preliminary Injunction for an early evidentiary hearing. After that hearing (the "Hearing") was held, with extensive evidence presented by both sides, the parties presented their post-Hearing submissions.

Defendants in this action are DCFS Director Gordon Johnson ("Johnson") and DCFS Guardianship Administrator Gary

Morgan ("Morgan").[1] DCFS is the state agency charged with, among other things, investigating allegations of child abuse and neglect throughout Illinois and caring for children and families who are the victims of child abuse and neglect. This action is concerned solely with cases in the Cook County Region.

Plaintiffs complain that DCFS has a policy and practice of failing promptly to assign a caseworker to court cases following the issuance of a temporary custody or protective (or supervision) order and of failing promptly to reassign court cases when a caseworker goes on leave, is terminated or resigns. Plaintiffs claim that alleged policy and practice violates both AAA and the Due Process Clause.

### Post–Hearing Procedures

This Court initially deferred issuance of its post-Hearing findings of fact and conclusions of law pending (2) then-awaited Supreme Court action and (2) DCFS' implementation of a restructuring plan directly addressing the delays in caseworker assignments.[2] Then just after the end of the Supreme Court's last term this Court issued its July 24, 1989 memorandum opinion and order (the "Opinion," 1989 WL 88525, 1989 U.S. Dist. LEXIS 9040 (N.D.Ill.)), requesting supplemental submissions from the parties as to:

1. whether *Will v. Michigan Department of State Police*, —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) rendered Section 1983 unavailable to plaintiffs;

2. whether AAA confers on plaintiffs the implied right of action necessary to establish subject matter jurisdiction; and

3. what standard (intentionally inflicted harm or something less) should be applied to plaintiffs' Due Process Clause claims and whether plaintiffs can meet that standard.

After those supplemental submissions had been tendered, defendants moved under Fed.R.Civ.P. ("Rule") 12(b)(6) for dismissal of the Complaint with prejudice for failure to state a claim. Defendants assert that *no* legal basis exists for any of plaintiffs' claims, pointing to four claimed defects that raise issues substantially similar (if not identical) to those framed in the Opinion:

1. Class A plaintiffs lack standing to sue under AAA because they are not in foster care.

2. AAA neither authorizes a private right of action nor gives rise to enforceable rights under Section 1983 to secure continuous caseworker assignments.

3. Plaintiffs' Due Process Clause claim is flawed because the Fourteenth Amendment does not mandate immediate, continuous caseworker assignment and because plaintiffs do not contend defendants acted intentionally.

4. *Will* bars plaintiffs' claim for sweeping injunctive relief.

This opinion addresses each of those contentions, though not in the same order.

### Implied Statutory Rights of Action and Section 1983 Rights of Action

Despite defendants' confluence of analysis as to the existence vel non of implied rights of action under AAA and enforceable rights under Section 1983, those are really two distinct inquiries. *Samuels v. District of Columbia*, 770 F.2d 184, 194 (D.C.Cir.1985) confirms that "statutory

---

**1.** Morgan testified that although he is named personally by the Juvenile Court as the custodian of children placed in the temporary custody of DCFS, day-to-day decisions regarding those children are made by DCFS personnel who are designated agents of the Guardianship Administrator and who are located in the Area Offices, Division of Child Protection, Interim Service Teams, Emergency Services Center and other units directly responsible for serving children in the care of DCFS. Morgan has no line authority over those persons, nor does he have any re-

sponsibility for developing generally any policies with respect to the care of children in DCFS' custody, or specifically with respect to the assignment of caseworkers. Accordingly, although named as a defendant, Morgan does not have any responsibility for the alleged practices and policies challenged in this action.

**2.** During the Hearing DCFS representatives had testified as to its adoption and ongoing implementation of that plan.

Section 1983 claims differ significantly from implied private rights of action." *Boatowners and Tenants Association, Inc. v. Port of Seattle,* 716 F.2d 669, 674 (9th Cir.1983) underscored that difference:

> There are both substantive and evidentiary distinctions between the two causes of action.

Because of those distinctions and in the interest of clarity, this opinion will examine each type of claim individually.

### 1. *Implied Rights Under AAA*

About the only legal proposition the parties here agree upon is that *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) establishes the framework for determining whether a statute contemplates an implied right of action for a given individual or class. To that end *Cort, id.* (citations omitted, emphasis in original) calls for this inquiry:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ... —that is, does the statute create a federal right in favor of the plaintiff? ... Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

■ Later refinements of the *Cort* analysis have brought matters to the situation well summarized in *King v. Gibbs,* 876 F.2d 1275, 1280–81 (7th Cir.1989):

> In its recent pronouncements, the Court has reaffirmed the use of the *Cort* test but has also made it clear that the principal focus is on the second of the *Cort* factors—whether the legislature intended to create a private cause of action. *See Cannon v. University of Chicago,*

441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). The first and third of the *Cort* factors are aids in determining that intent, *Touche Ross,* 442 U.S. at 575–76, 99 S.Ct. at 2488–89; *see also* P. Bator, D. Meltzer, P. Mishkin, D. Shapiro, *The Federal Courts and the Federal System* 946 (1988), and, by negative implication, it is unclear whether the fourth *Cort* factor—whether the cause of action is generally thought of as a matter of state concern—has any continuing significance. *But see Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 393, 102 S.Ct. 1825, 1847, 72 L.Ed.2d 182 (1982) (Court noted that fourth *Cort* factor favored implying private right of action under a provision of the Commodities Exchange Act.). In sum, unless a congressional intent to create the right of action "can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981).

It was against that backdrop that Opinion at 8 stated:

> At least until otherwise demonstrated, then, it must be considered that AAA provides plaintiffs no direct ticket of entry to this federal court.

That was not of course a prejudgment of the issue—it rather confirmed that the burden rested on plaintiffs to make an affirmative showing of congressional intent to create a private right of action (*Boatowners,* 716 F.2d at 674). Now they have sought to do just that.[3]

■ AAA's enactment antedated the Supreme Court's toughening stance on the implication of private causes of action for statutory violations. It is hardly surpris-

---

**3.** Until plaintiffs were called upon to respond to the Opinion, they had dealt only with issues bearing on the viability of a Section 1983 action. This is the first opportunity this Court has had to evaluate plaintiffs' arguments bearing on the implication of a private right of action under AAA.

ing, then, that AAA's provisions neither expressly create nor expressly deny a private right of action, and its legislative history is equally silent in that respect. Consequently the search has to shift to the general language and structure of the statute and to the circumstances of its enactment (see *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988)).

Initially plaintiffs urge that the circumstances surrounding AAA's enactment support implication of a private right of action. AAA was adopted as an amendment to the Social Security Act, a statute as to which the Supreme Court has allowed private enforcement (e.g., *Maine v. Thiboutot*, 448 U.S. 1, 4–8, 100 S.Ct. 2502, 2504–06, 65 L.Ed.2d 555 (1980); *Miller v. Youakim*, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979)). But that fact does not support the parallel inference plaintiffs seek to draw, for the cases to which they point were brought under Section 1983 and *not* directly under the substantive statute (the Social Security Act). Thus the amendatory character of AAA and the enforcement history of the underlying Social Security Act cannot alone carry the weight plaintiffs attempt to rest on their shoulders.

Nonetheless other courts have found support in AAA's language and internal structure for the implication of some rights of action. Such cases as *B.H. v. Johnson*, 715 F.Supp. 1387, 1402 (N.D.Ill.1989) and *Joseph A. by Wolfe v. New Mexico Department of Human Services*, 575 F.Supp. 346, 353 (D.N.M.1983) have allowed private plaintiffs to enforce the statute's procedural requirements of case plans and case reviews—a development conceded by defendants (Mem. 12).[4] Such private rights of enforcement are inferred from two parallel provisions of AAA:[5]

1. Section 627(a)(2)(B) says the eligibility of a state to receive an appropriation under AAA is predicated upon its implementation and operation of "a case review system ... for each child receiving foster care under the supervision of the state."

2. Section 671(a)(16) reiterates that requirement by listing as a "requisite" feature of each State plan that it "provide[ ] for the development of a case plan ... for each child receiving foster care maintenance payments ... and ... for a case review system ... with respect to each such child."

If those provisions suffice to grant private enforcement rights to the children for whom such case plans and case reviews are required, it seems only logical to draw parallel inferences from other requirements enumerated in the selfsame sections. Section 627(a)(2)(C) conditions a State's eligibility for AAA appropriations on its implementation and satisfactory operation of "a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship." Similarly Section 671(a) imposes not only the already-quoted case plan and review requirements but also mandates that every State plan must:

(9) provide[ ] that where any agency of the State has reason to believe that the home or institution in which a child resides whose care is being paid for in whole or in part with funds provided under this part or part B of this subchapter is unsuitable for the child because of the neglect, abuse, or exploitation of such child, it shall bring such condition to the attention of the appropriate court or law enforcement agency;

\* \* \* \* \* \*

(15) ... provide[ ] that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home....

---

4. Although they make that concession, defendants contend that the Complaint here fails to allege a violation of those rights. That contention is fully addressed below.

5. Because AAA (like Section 1983) is found in Title 42, its provisions will also be cited simply "Section—."

Certainly there is nothing to distinguish among the several statutory requirements—to suggest that one is less mandatory than the others. And that equal emphasis is confirmed by AAA's legislative history. In the Joint Explanatory Statement of the Committee of Conference, H.Conf.Rep. No. 96–900, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 1566–67, both "# 6. Case Plan & Case Review System" and "# 7. Preventive and Reunification Services" were given parallel billing among the subheadings listed under the heading "New Foster Care (and Adoption Assistance) State Plan Requirements."

In sum, if private plaintiffs have the right (as defendants in fact acknowledge they do) to enforce their statutory entitlements to case plans and case reviews, the rights of the plaintiff class here to obtain preventive and reunification services must enjoy the same standing.[6] Hence the predominant *Cort* factor—that of inferred legislative intent—is satisfied. And as the ensuing discussion reflects, the consideration of other *Cort* factors leads to the same conclusion.

For one thing, Congress certainly enacted AAA for the "especial benefit" of children coming within both Class A and Class B here—that is, both children in DCFS custody *and* children who are the subject of petitions filed in Juvenile Court but who remain at home under DCFS supervision by order of that court. Defendants give a distorted picture of AAA, arguing that States are given funds to provide services only to children *in* foster care. That reading glosses over (or misses entirely) the provisions strewn throughout AAA that require (not just encourage) States to provide services to children and families *in their homes* in an effort to reduce the numbers of children needing foster home placement:

1. Section 670 states "there are authorized to be appropriated for each fiscal year ... such sums as may be necessary to carry out the provisions of this part."

2. As already stated, Section 671(a)(15)(A) (emphasis added) requires that the State make reasonable efforts *"prior to* the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home...."

3. It is also worth noting that Section 627(b)(3) (emphasis added) requires a reduction in Title IV–B funds "unless such State ... has implemented a preplacement preventive service program designed to help children *remain* with their families."[7]

4. Section 672(a)(1) includes among the children qualifying for foster care maintenance payments program those whose "removal from the home occurred [as] the result of a judicial determination to the effect that ... reasonable efforts of the type described in section 671(a)(15) of this title have been made."

In light of these extensive statutory references to preplacement services, defendants' assertion that AAA applies only to children *in* foster care must be perceived as untenable (if not indeed disingenuous).

---

6. To the extent *B.H.,* 715 F.Supp. at 1401 reaches a different conclusion, this Court must disagree. *B.H., id.* coupled the "least restrictive setting" provision for individual placements with the statutory mandate of "reasonable efforts," finding each insufficient to create enforceable affirmative obligations on the states. Whatever the infirmities of the first of those criteria may be in that respect, they do not infect the "reasonable efforts" mandate. Courts have long proved themselves adequate to the task of enforcing contractual "best efforts" obligations, and they equally regularly enforce commitments of parties to conduct themselves "reasonably." No reason appears to treat AAA's statutorily-created contract any differently.

7. While Class A plaintiffs make no claims under that section, its very existence evidences Congress' intent to benefit not only children in foster care but also those children who, by virtue of being before the Juvenile Court, face the prospect of being taken into foster care. Defendants claim that reading AAA to apply to those children will in turn give rights of action to *all* children in the State—but that totally ignores the point that DCFS has filed a petition for adjudication of wardship in the Juvenile Court for every member of Class A, a fact that obviously sets those children apart from all others living at home inside the State.

Finally, implying a private right of action is fully consistent with the underlying purposes of the legislative scheme—the third *Cort* factor. As the above analysis reflects, that scheme must be understood as having two related parts:

    1. providing adequate services to children in foster care through a case plan and case review system; and

    2. keeping as many children as possible out of the foster care system by providing preplacement preventive services and family reunification services.

To imply a private right of action to enforce the former, while denying such a right as to the latter, defies common sense. *Both* classes of plaintiffs have implied causes of action to enforce their rights as established under AAA.

### 2. *Section 1983 Enforceable Rights*

■ In contrast to the just-completed discussion, a plaintiff who invokes Section 1983 to complain of a federal statutory violation need not show congressional intent to provide access to that remedy (*Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20 n. 31, 101 S.Ct. 2615, 2626 n. 31, 69 L.Ed.2d 435 (1980)). Instead, as *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 425, 107 S.Ct. 766, 771, 93 L.Ed.2d 781 (1986) articulates, Section 1983 is presumed to be available for such redress except where Congress has foreclosed such enforcement in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of Section 1983. Defendants claim both those exceptions apply here, but again they fail to persuade.

■ First defendants maintain that AAA does not create an enforceable right to prompt and continuous assignment of caseworkers. But whatever the validity of that proposition may be (a question that need not be resolved in this opinion), it is simply a straw man here: It misstates, rather than addressing head on, the claims advanced by the plaintiff classes.[8] And as for the rights plaintiffs *do* advance, the just-completed analysis has confirmed the existence of directly enforceable statutory rights under AAA. To reject such enforceability via Section 1983 would be anomalous indeed in light of the uniform authority exemplified by *Wright.*

Courts have consistently confirmed Section–1983–enforceable rights to case plans and case review systems (*L.J. by and through Darr v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988); *Lynch v. Dukakis*, 719 F.2d 504, 510–12 (1st Cir.1983); *B.H.*, 715 F.Supp. at 1402). This Court has already found those statutory commands equivalent to those called upon by plaintiffs here. And to the extent that *B.H., id.* at 1401 concluded that AAA's "reasonable efforts" provisions failed to meet the "clear" and "unambiguous" standard expressed in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981), as necessary to create a "contract" between the State and the federal government, this Court must again disagree.[9] Any State that read (or for that matter neglected to read) AAA and accepted federal funds under it had to know it was obliged both to provide case plan and case review services *and* to provide services aimed at preventing removal and facilitating reunification.

Nor does the holding in *Scrivner v. Andrews*, 816 F.2d 261, 263–64 (6th Cir.1987) that AAA did not create enforceable rights to "meaningful visitation" change the conclusions here. No provision of AAA man-

---

**8.** In part echoing AAA's statutory language, plaintiffs rather assert rights to (1) "reasonable efforts" to prevent removal of children from their homes, (2) "reasonable efforts" to facilitate reunification of families when removal has occurred, (3) notification of Juvenile Court or appropriate law enforcement agencies when a child is neglected, abused or exploited in placement and (4) development of case plans and a case review system to ensure that each child in placement is provided appropriate services. While the Complaint cites DCFS' failure promptly and continuously to assign caseworkers, it does so only in an attempt to illustrate the DCFS policies and practices that give rise to violations of the claimed rights.

**9.** See n. 6.

dates "meaningful visitation" in terms—or even implicitly.[10] And while *Scrivner, id.* at 263 correctly noted that AAA affords the State "considerable flexibility in unilaterally developing administrative procedures" to implement its foster care program, that cannot render the State free to ignore other obligations expressly imposed by AAA's language. In that respect *Wright,* 479 U.S. at 431–32, 107 S.Ct. at 775 made it plain that the use of the word "reasonable" in a statutory provision does not render the requirement too vague or ambiguous to be enforced.

Defendants also fail to demonstrate that Congress intended to foreclose the use of Section 1983 to enforce the rights secured under AAA. Although AAA does establish some enforcement mechanisms, they are not "sufficiently comprehensive and effective to raise a clear inference that Congress intended to foreclose a § 1983 cause of action ..." (*Wright,* 479 U.S. at 425, 107 S.Ct. at 771). To that end defendants point to three AAA provisions as the assertedly comprehensive remedial scheme:

    1. the ability of the Secretary of the Department of Health and Human Services to withhold funds (Section 671(b));

    2. the state plan providing for a post-deprivation hearing (Section 671(a)(12)); and

    3. the dispositional hearing (Section 675(5)(C)).

*Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1969) rejected just such an argument based on a power wholly parallel to the first of those,[11] stating the Court was "most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program." And certainly the statute's limited administrative remedies (the second and third cited factors) do not constitute a comprehensive remedial scheme precluding Section 1983 relief (*Wright,* 479 U.S. at 424, 107 S.Ct. at 771)—as *Lynch,* 719 F.2d at 512 recognized, they are utterly unresponsive to cases like the one at bar "where a class alleges systemic malfeasance."

It is clear, then, that AAA does create enforceable rights and that Congress has not precluded their enforcement with a comprehensive remedial scheme. Hence plaintiffs have a cause of action under Section 1983 as well as directly under AAA.

### *Will and the Eleventh Amendment* [12]

This is undeniably an official-capacity lawsuit against Johnson. It therefore becomes necessary to examine *Will*'s restrictive definition of the "persons" entitled to invoke Section 1983.

*Will,* 109 S.Ct. at 2312 says flatly:

> Neither a State nor its officials acting in their official capacities are "persons" under § 1983.

Without more, than unqualified assertion would render Johnson—wearing his official-capacity hat—immune to plaintiffs' present action. But *Will, id.* at 2311 n. 10 restores what the quoted sentence seems to take away: It imports familiar principles of Eleventh Amendment jurisprudence to provide an exception to the apparently rigid and restrictive definition of "persons." Calling on the fiction (originally expounded in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)) that any state official who violates constitutional rights is perforce stripped of his or her official character and is thus no longer protected by the

---

**10.** That absence of a specific obligation of the nature sought to be enforced in *Scrivner* contrasts sharply with the statutory duty to make specifically-defined "reasonable efforts," on which plaintiffs rely here.

**11.** In *Rosado* the State defendant relied on HEW's power to cut off federal funds. It should also be emphasized that *Rosado* remains good law today (always a source of concern in citing Supreme Court decisions of a legal gener-

ation ago). It was cited as authority on precisely this point in *Wright,* 479 U.S. at 428, 107 S.Ct. at 773.

**12.** Since issuing the Opinion this Court has had occasion to address the issues treated in this section in *Illinois Health Care Ass'n v. Suter,* 726 F.Supp. 191 (N.D.Ill.1989). Instead of reinventing the wheel, this opinion borrows both freely and unabashedly from that prior effort.

sovereign's immunity, *Will*'s n. 10 (citations omitted) says:

> Of course a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official capacity actions for prospective relief are not treated as actions against the State." ... This distinction is "commonplace in sovereign immunity doctrine," ... and would not have been foreign to the 19th-century Congress that enacted § 1983....

■ Thus the operative question becomes whether plaintiffs' prayer for declaratory and injunctive relief falls into the category of actions seeking prospective relief, allowable under Section 1983 by *Will*'s n. 10 and under the Eleventh Amendment by *Ex parte Young*, or into the disallowed category of actions seeking to tap the State treasury. By now it is familiar doctrine that the line between such allowed and disallowed actions is not one between night and day—for the simple fact that the sought-after relief will have adverse fiscal consequences for the sovereign will not automatically bar the claim (*Edelman v. Jordan*, 415 U.S. 651, 667–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1973)). Instead a court must look beneath the surface of plaintiffs' claims to determine their true objectives in the terms made dispositive by *Ex parte Young* and its progeny.

*Edelman, id.* at 668, 94 S.Ct. at 1358 has made it plain that no matter how it is labeled, any relief that amounts to a damage award will be barred by the Eleventh Amendment. Had plaintiffs here sought compensation for the claimed past harm stemming from Johnson's allegedly illegal foster care scheme, this Court would have had to dismiss their claim. But plaintiffs have made it equally clear that such is *not* their intention, nor would such reimbursement automatically flow from their success on the merits. As plaintiffs would have it, a declaration by this Court to the effect that Johnson is violating the specified provisions of AAA, coupled with an injunction compelling future compliance, would provide the necessary impetus (1) to force DCFS to live up to its obligations under AAA or (2) if it is unwilling to comply, to force it to bail out of the cooperative state-federal plan and go it alone in the area of foster care, free from the federal requirements.[13]

Obviously the latter option would involve no necessary drain on the sovereign's fisc. And although the alternative of compliance with AAA (which may be assumed to represent plaintiffs' preferred outcome) *would* impact state finances, the existence of such financial impact is not itself dispositive. As *Papasan v. Allain*, 478 U.S. 265, 278–79, 106 S.Ct. 2932, 2940–41, 92 L.Ed.2d 209 (1985) teaches:

> [R]elief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

By contrast, *Edelman*, 415 U.S. at 668, 94 S.Ct. at 1358 held the underlying claim in that case was retrospective and violative of the Eleventh Amendment because the amount of fiscal burden placed on the State would be measured in terms of a monetary loss resulting directly from a *past* breach of a legal duty on the part of the defendant State officials.

It seems the line between an "ancillary" economic effect (permitted by the Eleventh

---

**13.** Plaintiffs' prayer for relief seeks entry of a specific order requiring DCFS to adopt a plan with certain substantive elements. As long as such a plan was only forward-looking, it would not run afoul of the principles discussed in this section. It would, however, present another problem. While this Court must enforce the mandatory requirements of federal law, it should not become involved in micromanagement of the State child care system. Rather as *Lynch*, 719 F.2d at 513 (summarizing *Rosado* ) noted:

> [I]n such cases the district court should announce what is necessary to comply with the federal program and then allow an appropriate period of time for the state to decide whether it preferred to forego [sic] federal funds. If the state decides to retain funding it must propose a plan for achieving compliance which would then be subject to court approval.

Amendment) and a "direct" effect (barred by that Amendment) depends on whether the finding of State violations of federal law will be accompanied by an order to make whole the individuals who were injured by those past violations. If the federal court simply orders a State to conform its future conduct to the requirements of federal law, even though that will cost money (even a good deal of it) the future impact on the State treasury is normally perceived as "ancillary" (*Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979)).

■ Here plaintiffs make no plea for reparations of the harm caused by Johnson's alleged past violations of the Act, asking instead only for a declaration as to whether Johnson's admitted conduct amounts to a continuing violation of the Act and, if that is so, for a preliminary injunction. Neither *Will* nor the Eleventh Amendment bars this action in Section 1983 terms.

### Due Process Clause

■ *DeShaney v. Winnebago County Department of Social Services,* —— U.S. ——, 109 S.Ct. 998, 1004–07, 103 L.Ed.2d 249 (1989) teaches that the Due Process Clause imposes no affirmative obligations on the State to provide services to the general public—instead, such duties attach only "in certain limited circumstances [where] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals" (*id.* 109 S.Ct. at 1004–05). For that reason Opinion at 11–13 directed the parties to address the inquiry as to whether Class B plaintiffs—those in DCFS' custody [14]—meet that test. That inquiry now gets an affirmative answer.

*DeShaney,* 109 S.Ct. at 1006 n. 9 specifically left open the question as to whether children whom the State removes from their homes and places in foster homes enter into a special relationship with the State giving rise to an affirmative right to protection. Despite that properly cautious

reservation of an issue not directly before the Supreme Court, this Court finds strong signals in *DeShaney*'s characterization of the treatment of involuntarily committed mental patients in *Youngberg v. Romeo,* 457 U.S. 307, 315–17, 102 S.Ct. 2452, 2457–59, 73 L.Ed.2d 28 (1972). *DeShaney,* 109 S.Ct. at 1005–06 (citations omitted) explained *Youngberg* this way:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

To counter the parallel thrust of *Youngberg* (and its reconfirmation in *DeShaney*), defendants adduce *Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 510–11, 102 S.Ct. 3231, 3236–37, 73 L.Ed.2d 928 (1981) for the proposition that children in foster care are not under the direct physical control of the State and are no more restrained than children living with their own parents. *Lehman* cannot rule the day. It was a habeas case that addressed a set of concerns (whether the children were in "custody" in traditional habeas terms) very different from those relevant here. But when DCFS obtains an order to remove a child from his or her home and takes that child into protective custody, it is surely exercising affirmative State power over that child to the extent that it must assume responsibility to provide for the child's basic needs. To hold otherwise would be to turn a blind eye on the realities facing a child who has been removed from home. Many courts (see, e.g., this Court's opinion in *Rubacha by Rubacha v. Coler,* 607 F.Supp. 477, 479 (N.D.Ill.1985), and see cases collected in *DeShaney,* 109 S.Ct. at 1006 n. 9) have reached precisely that conclusion.

---

**14.** Only Class B plaintiffs assert violations of their rights to due process. Had Class A plain-

tiffs sought to do the same, that claim would have been blocked by *DeShaney*.

■ Establishment of the required "special relationship" between the State and the Class B plaintiffs does not end the inquiry. It remains to consider by what standard the State's conduct must be measured under the "special relationship" doctrine. In that respect *Archie v. City of Racine,* 847 F.2d 1211, 1218–20 (7th Cir.1988) provides the necessary guidance.

*Archie* began with the basic rule of *Daniels v. Williams,* 474 U.S. 327, 331–36, 106 S.Ct 662, 664–67, 88 L.Ed.2d 662 (1986) and *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986) that merely negligent State conduct does *not* constitute a deprivation under the Due Process Clause. *Archie* went on to the question left open by *Daniels, id.* at 334 n. 3, 106 S.Ct. at 666 n. 3:

> Whether something less than intentional conduct, such as recklessness or "gross negligence," is enough to trigger the protections of the Due Process Clause.

Because " '[r]ecklessness' is a proxy for intent [and] 'gross negligence' is not," *Archie,* 847 F.2d at 1220 reasoned that only recklessness or something greater can give rise to a due process violation. And because use of the tort law definition of recklessness would not adequately distinguish between constitutional and common law obligations, *Archie, id.* at 1219 explained further:

> An act is reckless in the pertinent sense when it reflects complete indifference to risk—when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death.

Here Class B plaintiffs allege violations of their "constitutionally protected interests in conditions of reasonable care and safety" (*Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462), including both physical safety (*Rubacha,* 607 F.Supp. at 479) and emotional well being (*B.H.,* 715 F.Supp. at 1394). Thus the proper inquiry is whether defendants' conduct reflects complete indifference to a known significant risk to such physical and emotional safety. Even with the required reasonable inferences in Class B plaintiffs' favor, nothing alleged in the Complaint here suggests such total indifference on defendants' part. Class B plaintiffs cannot properly maintain a cause of action under the Due Process Clause.

### Conclusion

Defendants' motion to dismiss is granted only as to plaintiffs' due process claim. It is denied in all other respects. That leaves open the substantive issues posed by plaintiffs' Motion for Preliminary Injunction and the extended Hearing. Because those issues may be impacted importantly by the current status of DCFS' restructuring plan described during the Hearing:

1. On or before November 30, 1989, defendants are ordered to file and to serve on plaintiffs' counsel a written report on that current status.

2. This case is set for a status hearing at 9 a.m. December 7, 1989 to treat any questions that report may have left unanswered.