**ARTIST M., et al., Plaintiffs–Appellees,**

v.

**Gordon JOHNSON and Gary T. Morgan, Defendants–Appellants.**

**Nos. 90–1742, 90–1764.**

United States Court of Appeals, Seventh Circuit.

Argued June 20, 1990.

Decided Oct. 29, 1990.

Rehearing and Rehearing En Banc Denied Dec. 20, 1990.

Patrick T. Murphy, Jeanette DeGrange, Susan T. Pierce, Julie Lynn Biehl, Michael G. Dsida, Office of the Public Guardian, Chicago, Ill., for plaintiffs-appellees.

Paula Giroux, Asst. Atty. Gen., Christina M. Tchen, Susan Getzendanner, Charles F. Smith, Kimberley K. Baer, Christina E. Wells, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for defendants-appellants.

Diane Redleaf, Laurene M. Heybach, Susan Wishnick, Joan Matlack, Legal Assist-

ance Foundation of Chicago, Chicago, Ill., for Joann Mitchell, Wanda Hilliard and Putative Class in Norman V. Johnson, 89 C 1624 (Northern District of Illinois), amici curiae.

Gregory L. Evans, Nat. Coalition for the Homeless, Washington, D.C., for Nat. Coalition for the Homeless, amicus curiae.

Michael L. Brody, Schiff, Hardin & Waite, Chicago, Ill., for Nat. Children's Rights Project of the American Civil Liberties Union, Legal Services Organization of Indiana, Roger Baldwin Foundation of the American Civil Liberties Union and Children's Defense Fund, amici curiae.

Before CUMMINGS and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

The plaintiffs in this class action suit allege that the Department of Children and Family Services (the "DCFS"), an agency of the State of Illinois, fails to assign caseworkers to members of their class in a timely manner and that this violates the federal Adoption Assistance and Child Welfare Act of 1980 (the "AAA").[1] Defendants Gordon Johnson and Gary Morgan are director and guardianship administrator, respectively, of the DCFS. They appeal from the entry of a preliminary injunction and enforcement order requiring them to adhere to the AAA's minimum requirements in several specific respects, and from the denial of their motion to dismiss the complaint.[2] We affirm.

## I. Procedural Background

The DCFS[3] and the State's Attorney's Office screen reports of abused, neglected, or dependent children and, on the

---

1. The AAA is incorporated in Title IV, Parts B and E, of the Social Security Act. 42 U.S.C. §§ 620–628, 670–679(a).

2. Allegations of violations of the federal Constitution are no longer part of this case. The district court granted defendants' motion to dismiss plaintiffs' due process claim and there has been no cross-appeal. See n. 5 *infra*.

3. For convenience, we follow the district court's latest memorandum opinion in referring to the

defendants collectively as the DCFS. A state official sued for injunctive relief in his or her official capacity is a "person" for the purposes of a Section 1983 action, and therefore the plaintiffs' suit is not barred by the Eleventh Amendment. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45.

basis of some of those investigations, the DCFS files petitions in the Juvenile Division of the Circuit Court of Cook County, Illinois ("Juvenile Court"). Following Juvenile Court hearings, some of the subjects of those petitions become wards of the Juvenile Court under the supervision of the DCFS. In some cases the Juvenile Court will award temporary custody of the child to the DCFS as custodian and in others the child will be returned to the custody of his or her parents under protective order.

Plaintiffs, wards of the Juvenile Court, filed this class action in December 1988 for alleged violations of the AAA by the DCFS. The class and a subclass were certified pursuant to Fed.R.Civ.Proc. 23(c)(1) shortly after suit was filed. Class A is composed of all children who are or will be subjects of Juvenile Court petitions, who are or will be in the custody of DCFS (or in a home under DCFS supervision) by an order of the Juvenile Court, and who are or will be without a DCFS caseworker for a significant period of time. Class B, the subclass, is identical to Class A except that Class B does not include children who are in a home under DCFS supervision by order of the Juvenile Court.

Plaintiffs allege that the DCFS violates the rights of class members by failing promptly to assign caseworkers to children under protective or supervisory court orders and also by failing promptly to reassign cases when a caseworker goes on leave, is terminated, or resigns. *Artist M. v. Johnson,* 726 F.Supp. 690, 692 (N.D.Ill. 1989). These alleged policies and practices of the DCFS purportedly violate Sections 671(a)(9), (a)(15), and (a)(16) of the AAA.[4] The plaintiffs assert that failure to assign caseworkers or to ensure that caseworkers hand off cases to each other promptly contributes to unnecessary abuse, neglect, and disintegration of families. Cast in terms of the AAA's requirements, the plaintiffs specifically allege that the DCFS fails to: (1) make "reasonable efforts" to prevent the removal of children from their homes, (2) make "reasonable efforts" to reunify with their families those children who have been removed from their homes, (3) notify appropriate agencies when a child is mistreated while placed in another home, and (4) develop case plans to assure proper services are provided to children while in placement. *Artist M.,* 726 F.Supp. at 696 n. 8.

Plaintiffs sued the DCFS under 42 U.S.C. § 1983, under the AAA directly, and under the Due Process Clause of the Fourteenth Amendment.[5] Defendants moved under Fed.R.Civ.Proc. 12(b)(6) for dismissal for

4. Section 671 states in relevant part (with emphasis supplied for a phrase that has become a focus of this case):

§ 671. **State plan for foster care and adoption assistance**
(a) **Requisite features of State plan**
In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

\* \* \* \* \* \*

(9) provides that where any agency of the State has reason to believe that the home or institution in which a child resides whose care is being paid for in whole or in part with funds provided under this part or part B of this subchapter is unsuitable for the child because of the neglect, abuse, or exploitation of such child, it shall bring such condition to the attention of the appropriate court or law enforcement agency;

\* \* \* \* \* \*

(15) effective October 1, 1983, provides that, in each case, *reasonable efforts* will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return home;

(16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meet [sic] the requirements described in section 675(5)(B) of this title with respect to each such child; \* \* \*.

5. Although the district court found that in some circumstances Class B plaintiffs might properly maintain a due process clause action against defendants, it dismissed this claim because those plaintiffs failed to allege complete indifference on the part of defendants. *Artist M.,* 726 F.Supp. at 700. This portion of the November 1989 order is not before this Court. The district court observed that if Class A plaintiffs had asserted due process claims, they would have been barred by *De Shaney v. Winnebago Co. Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (state's failure to protect child from father's abuse did not violate child's substantive due process rights). *Artist M.,* 726 F.Supp. at 699 n. 14.

failure to state a claim upon which relief could be granted. On November 21, 1989, Judge Shadur dismissed Class B plaintiffs' due process claim but denied the motion in all other respects, holding that plaintiffs could maintain a cause of action under Section 1983 as well as directly under the AAA. *Artist M.*, 726 F.Supp. at 696–697.

Thereafter the district court held a hearing with respect to the plaintiffs' request for injunctive relief. On March 2, 1990, the district court entered a preliminary injunction enjoining the DCFS from failing to assign a caseworker to plaintiffs within three working days of the time the case is first heard in Juvenile Court and from failing to reassign a caseworker within three working days after a previously assigned caseworker relinquishes any portion of the case. On April 3, 1990, the court amended the injunction by entering an order designed to monitor DCFS compliance with its terms.[6] The DCFS filed timely notices of appeal seeking review of the injunctive orders dated March 2 and April 3, 1990,[7] as well as the November 21, 1989, order disposing of the DCFS motion to dismiss.

After hearing oral argument, this Court entered an order on June 21, modified on June 27, partially remanding this cause to the district court. The district court was to make factual findings regarding the nature of delays in caseworker assignments and the progress of DCFS reforms as they existed at the time the district court issued its March 2, 1990, injunction order. In light of

the fact that the DCFS had voluntarily instituted a Reorganization Plan that could have affected the concerns addressed by plaintiffs, the district court was requested to make findings with respect to the extent of delay in caseworker assignment and reassignment at the time the injunction order issued.

After receiving submissions on these questions from the parties, the district court issued its memorandum opinion and findings on July 25, 1990. It is evident that the findings reflect the status of relevant DCFS activities at the time the injunction order issued because by agreement of the parties, the February 1990 logs of the DCFS regarding caseworker assignment were made an exhibit to a stipulated submission to the district court and the January and February activities of the DCFS were closely scrutinized by the district court.

The findings strongly support the district court's decision to issue an injunction. We will not attempt here to summarize these detailed findings, which are heavily cited to specific sources in the record. The district court reached the following conclusions: (1) the DCFS failed to show that its Reorganization Plan, begun during the summer of 1988 and purportedly completed by July 16, 1989, moved the agency closer to the "reasonable efforts" required by the AAA[8]; (2) the DCFS demonstrated "a total lack of credibility" by pledging to make such changes and then failing to take effective steps to fulfill that pledge.[9]

6. The April 3, 1990, order established a weekly reporting mechanism for compliance with the March 2, 1990, preliminary injunction. Every Friday, the DCFS must provide the Office of the Public Guardian (counsel for plaintiffs) with a list of all of the class members whose cases have just entered Juvenile Court or who have recently lost their caseworker, along with the names of involved caseworkers and relevant dates of commencement or completion of assignments.

7. The parties dispute the appealability of the April 3, 1990, order in which Judge Shadur modified the terms of the preliminary injunction entered March 2, 1990. The order of April 3 provided the district court with a mechanism to monitor defendants' compliance with the substantive portions of the injunction. This order is appealable pursuant to 28 U.S.C. § 1292(a)(1)

as an order modifying the terms of an injunction. Accordingly, this Court has jurisdiction to review the terms of that order.

8. Findings bearing on this point are Numbers 21–37. For example, the total number of unassigned cases jumped from 232 on June 30, 1989, to 404 by year's end and the number of cases unassigned for over 30 days doubled over the same period of time. Finding 36.

9. Findings bearing on this point are found at p. 3 n. 5 and p. 15 n. 10 of the court's memorandum, as well as in Findings Numbers 28–37. To cite only one example, the two officials to whom DCFS entrusted oversight of one aspect of its alleged remedies reviewed the program only two times during 1989. Finding 29.

## II. The Adoption Assistance and Child Welfare Act of 1980

In 1980 Congress enacted the AAA as an amendment to the Social Security Act. 42 U.S.C. §§ 620–628, 670–679(a). It was in part an effort to "lessen the emphasis on foster care placement and * * * encourage greater efforts to find permanent homes for children either by making it possible for them to return to their own families or by placing them in adoptive homes." S.Rep. No. 96–336, reprinted in 1980 U.S.Code Cong. & Admin. News 1448, 1450 (96th Cong., 2d sess.). It sought to achieve those goals by providing states with "incentives to encourage a more active and systematic monitoring of children in the foster care system." *Vermont Dep't of Social and Rehab. Servs. v. United States Dep't of Health and Human Servs.*, 798 F.2d 57, 59 (2d Cir.1986), certiorari denied, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999. These goals are particularly evident in the requirement discussed below that states must make "reasonable efforts" to prevent the need for removal of children from their homes and to make it possible for children who have been taken from their homes to return to their homes. 42 U.S.C. § 671(a)(15).

The provisions of the AAA are codified in two separate parts of Title IV of the Social Security Act. Title IV–B provides funds to the states for the improvement of child welfare services. 42 U.S.C. §§ 620–628. Title IV–E provides reimbursement to the states for foster care maintenance and adoption assistance payments made by the states on behalf of eligible children. 42 U.S.C. §§ 670–679(a). Federal funding is provided under the Title IV–B program for child welfare services "which are directed toward the accomplishment" of a list of enumerated purposes, which include the following: "preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible"; "restoring to their families children who have been removed, by the provision of services to the child and the families"; and "assuring adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption." 42 U.S.C. § 625(a)(1)(C), (D), (F).

Section 622 of Title IV–B sets forth various features state plans must possess in order to be eligible for payments for these child welfare services. Additional funds may be allocated to a state that, among other conditions irrelevant for purposes of this appeal, implements a "case review system" for each child receiving foster care under the supervision of the State and a "service program." Service programs are to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship. 42 U.S.C. § 627(a)(2)(B), (C).[10] Failure of a state to maintain a plan in compliance with any requirement established in Section 627 may result in the termination or reduction of funds. 42 U.S.C. § 627(b).

Turning to Title IV–E, Section 671 lists explicit requirements, strikingly similar to those found in 42 U.S.C. § 627(a)(2)(B) and (C) outlined above, with which the state must comply in order to be eligible for funding. 42 U.S.C. § 671(a)(16). As set out in footnote 4 of this opinion, Section 671(a)(15) mandates that the state plan must provide "that, in each case, reasonable efforts will be made * * * to prevent or eliminate the need for removal of the child from his home, and * * * to make it possible for the child to return to his home." Likewise, Section 671(a)(16) requires that the plan provide for the development of a "case plan" and "case review system," the elements of which are given in Section 675(1) and Section 675(5)(B), respectively. A case plan, for example, is

---

**10.** See also the examples listed by the Secretary of Health and Human Services as steps that may be taken toward compliance with Sections 627(a)(2)(C) and 427(b)(3). 45 C.F.R. § 1357.15(e)(2) (1989) (listing such measures as crisis counseling, drug and alcohol abuse counseling, and provision of temporary child care as potential elements in programs to permanently place children, if possible back with their own families).

defined as a written document that among other things includes a plan for assuring that services are provided to facilitate the return of the child to his own home or the permanent placement of the child. 42 U.S.C. § 675(1)(B). The final provision relevant to this appeal, Section 671(a)(9), requires that the plan provide for the reporting of unsuitable living conditions to law enforcement officials.

### III. The November 1989 Order

■ Although the November 21, 1989, order denying the bulk of the DCFS motion to dismiss is not immediately appealable by itself, this Court may review that order in connection with the injunction if the injunction turns on the validity of that order, *Elliott v. Hinds*, 786 F.2d 298, 301 (7th Cir.1986), or if the dismissal order is so entwined with the injunction order that judicial economy compels review. *Asset Allocation & Mgt. Co. v. Western Employers Ins. Co.*, 892 F.2d 566, 568–569 (7th Cir. 1989); *Parks v. Pavkovic*, 753 F.2d 1397, 1402 (7th Cir.1985), certiorari denied, 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653, 474 U.S. 918–919, 106 S.Ct. 246–247, 88 L.Ed.2d 255. Because evaluation of the likelihood of success turns as an initial matter on whether plaintiffs may maintain a cause of action against the DCFS under 42 U.S.C. § 1983 or directly under the AAA, the Court will reach the merits of the November order, which addressed those issues. We employ a *de novo* standard in reviewing these legal determinations. Because each of the lower court's legal conclusions regarding Section 1983 and an implied private right of action under the AAA requires a slightly different inquiry, they will be addressed separately. See *Boatowners and Tenants Ass'n, Inc. v. Port of Seattle*, 716 F.2d 669, 674 (9th Cir.1983).

### A. Section 1983 Action

■ Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. A plaintiff may pursue a cause of action under Section 1983 for violations of a federal statute.

*Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (violations of Social Security Act enforceable under the "and laws" provision of Section 1983). Yet the Supreme Court recently reiterated that no action will lie if the statute does not create enforceable "rights, privileges or immunities" within the meaning of Section 1983 or if Congress foreclosed this avenue of relief in the enactment itself. *Wilder v. Virginia Hospital Ass'n*, —— U.S. ——, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455. Though plaintiffs must point to a substantive provision that gives them a tangible right, privilege, or immunity, the burden is on the defendants to demonstrate that Congress intended to foreclose private enforcement of a right that is otherwise evident. *Wright v. City of Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 423–424, 107 S.Ct. 766, 770–771, 93 L.Ed.2d 781 (" 'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right") (quoting *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746).

■ 1. Existence of an Enforceable Right.—A statute will not be found to have created an enforceable right unless the provision in question is intended to benefit the plaintiff, the provision imposes a binding obligation on the state, and the right is not so amorphous that courts are unable to adequately enforce it. *Wilder*, 110 S.Ct. at 2517. The majority held in *Wilder* that an amendment to the Medicaid Act providing for "reasonable and adequate" reimbursement rates for health care providers creates an enforceable right under Section 1983. The Court found that the amendment was intended to benefit the health care providers, represented a binding obligation on the state of Virginia, and was not relied upon by the health care providers to pursue overly vague or amorphous interests. *Wilder*, 110 S.Ct. at 2517–2523.

The DCFS asserts that the "reasonable efforts" clause of Section 671(a)(15) fails in each of these respects and that therefore the clause does not provide plaintiffs with a

right enforceable under Section 1983. That Congress enacted the AAA to benefit children such as those in the plaintiff classes cannot be seriously disputed. The Act's stated purposes are to strengthen assistance for needy children, improve welfare services, and aid families with dependent children. Both classes of plaintiffs consist of children who receive services pursuant to plans implemented by the state in accordance with the AAA and who, aside from parents, are the only direct beneficiaries of the Act's provisions.

In determining whether a federal enactment imposes a binding obligation on a state, courts look to "the context of the entire statute and its legislative history" for such congressional intent. *Wilder,* 110 S.Ct. at 2518; *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 13, 101 S.Ct. 1531, 1537–1538, 67 L.Ed.2d 694. The provisions sought to be enforced here are located in the Section setting forth in mandatory language the features a state plan must possess before funding will be provided. §§ 671(a)(9), (a)(15), (a)(16). When the right asserted is tied explicitly to the funding provision, the Supreme Court has found the requisite congressional intent. *Wilder,* 110 S.Ct. at 2519–2520 (funding conditioned on state setting reasonable and adequate rates created enforceable right under the Boren Amendment); *Wright,* 479 U.S. at 424, 107 S.Ct. at 771 (regulation requiring reasonable allowance for utilities as condition for receiving federal funds created enforceable right under Brooke Amendment); but see *Pennhurst,* 451 U.S. at 13, 101 S.Ct. at 1537–1538 (right to be placed in least restrictive environment did not create enforceable right under Developmentally Disabled Assistance and Bill of Rights Act of 1975, in part because right not tied explicitly to funding provision). Because the rights asserted here are tied indisputably to the funding provision the case is readily distinguishable from *Pennhurst* and, consequently, the AAA obligations are binding on the state.

Finally, this Court must determine whether the asserted rights are sufficiently explicit that the pertinent clauses are judicially enforceable. *Wilder,* 110 S.Ct. at 2517. The district court rejected the DCFS challenge on this ground based on the fact that courts routinely enforce contractual clauses which mandate that the parties exert "best" or "reasonable" efforts in complying with the terms of the contract. *Artist M.,* 726 F.Supp. at 695 n. 6. In *Wilder,* the Supreme Court stated that simply because a provision gives the state great latitude in promulgating a "reasonable and adequate" rate does not render the provision unenforceable for vagueness. Instead, once the state exercises its discretion to select a method of calculating rates a court is still capable of determining whether the rate itself is reasonable in light of the method chosen. *Wilder,* 110 S.Ct. at 2522–2523. This same reasoning is applicable here. The Act requires that the state implement a plan that provides for reasonable efforts directed at preventing the removal of a child from home or, if the child is removed, to return the child to his family. 42 U.S.C. § 671(a)(15). The DCFS chose to use caseworkers as the means through which these services are provided. The DCFS concedes that although a caseworker does not herself provide services, caseworkers are necessary to arrange for the provision of services by others (Plaintiffs' Br. at 18). The caseworker is a "lifeline." When the caseworker is absent, no efforts can be exerted for preventive and reunification services. See District Court's July 25, 1990, Findings, Findings 4–12.

Just as the Supreme Court in *Wilder* acknowledged that the State of Virginia had substantial discretion to choose the method it would use in calculating reimbursement to health care providers, so the DCFS has substantial discretion in choosing the method it will use to implement the requirements of the AAA. The judiciary is nevertheless capable of determining whether the state is exerting "reasonable efforts" to provide those services. The DCFS therefore cannot maintain that even if Section 671(a)(15) gives rise to an enforceable right, that right cannot be said to encompass a right to expeditious caseworker assignments. Instead, a court may evaluate the reasonableness of the efforts to

secure those services by looking to the caseworker assignment process. As discussed in more detail below in Section IV, based on the district court's factual determination that DCFS fails to exert reasonable efforts to provide services mandated by the Act, the district court could order the remedy found in the preliminary injunction, namely expeditious assignment of caseworkers, to remedy that deficiency.

The district court rejected a request from the plaintiffs for a more stringent remedy, which called for the mandatory assignment of a caseworker to each of the plaintiffs and their families within 24 hours after the Juvenile Court places them in the temporary custody of the DCFS or returns them home under the supervision of the DCFS. The district court has also not attempted to fashion a remedy that interferes with the daily operations of the DCFS. Compare *L.J. ex rel. Darr v. Massinga*, 838 F.2d 118, 119–120 (4th Cir.1988) (affirming broad interim and permanent injunctive relief, including expansion of medical relief to children), certiorari denied, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805; see also *B.H. v. Johnson*, 715 F.Supp. 1387, 1402 (N.D.Ill. 1989) (plaintiffs requesting on the basis of AAA standards "sweeping duties" such as an adequate number of caseworkers, family reunification services, services to "troubled families," or rights of meaningful visitation between siblings). It is important to note that the three-day requirement fits the estimate given by the DCFS itself of how quickly it would assign caseworkers under its promised reforms (Preliminary Inj. at 6). This makes it difficult for the DCFS to argue that a requirement of "reasonable efforts" is too ambiguous to be enforceable. The district court sought out and discovered a method of enforcing the "reasonable efforts" requirement that is tailored to DCFS practices. In this way, the district court has refrained from injecting itself into the operations of the DCFS any further than is required by the federal right that is enforceable under Section 1983.

As the Fourth Circuit held, after reviewing an action under Section 1983 for the enforcement of rights created by the same provisions at issue here:

> Taken together we think that these statutory provisions spell out a standard of conduct, and as a corollary[,] rights in plaintiffs, which plaintiffs have alleged have been denied. It is true that the statutes are largely statutes relating to appropriations, but defendants' argument to the contrary notwithstanding, they are privately enforceable under 42 U.S.C. § 1983. *L.J. ex rel. Darr*, 838 F.2d at 123 (1988).

 2. Congressional Intent to Foreclose § 1983 Remedy.—In the absence of either a comprehensive remedial scheme for violations of a statute or an explicit, exclusive private cause of action found in the statute itself, Congress cannot be said to have intended to foreclose Section 1983 as a remedial vehicle for statutory violations. *Wright*, 479 U.S. at 423, 107 S.Ct. at 771; accord *Wilder*, 110 S.Ct. at 2523–2524. The availability of a state administrative review procedure does not necessarily foreclose a Section 1983 cause of action, *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172, nor does the ability of the overseeing federal agency to reduce or cut off federal funds for violations of the AAA. *Wilder*, 110 S.Ct. at 2519; *Wright*, 479 U.S. at 424, 428, 107 S.Ct. at 771, 773.

 The AAA provides that if any state plan fails to abide by the conditions set forth in Section 671(a), the Secretary may reduce or cut off funding. 42 U.S.C. § 671(b). The Act does not provide for private citizen suits directly or the right to judicial review or a comprehensive system of procedures and guarantees. None of the district courts in this Circuit that have considered such suits have found that the limited remedial scheme found in the AAA indicates an intent on behalf of Congress to foreclose Section 1983 as a remedy for violations of the Act. *Norman v. Johnson*, 739 F.Supp. 1182, 1185 (N.D.Ill.1990) (Hart, J.); *B.H. v. Johnson*, 715 F.Supp. 1387, 1403–1404 (N.D.Ill.1989) (Grady, C.J.); *Aristotle P. v. Johnson*, 721 F.Supp. 1002, 1011 (N.D.Ill.1989) (Williams, J.). In light

of the limited nature of the review provisions under the Act and the lack of any comprehensive remedial scheme, Congress did not intend to foreclose resort to Section 1983 as a cause of action under the AAA.

### B. Implied Cause of Action Under the Act

■■■ The AAA does not expressly authorize a private right of action enabling those disadvantaged by its violation to enforce its terms. Nevertheless, even if the plaintiffs could not pursue their claims under Section 1983, we conclude that the AAA contains an implied right of private action.

■■■■■ Four factors are to be used in attempting to determine whether Congress intended to make a private remedy available: (1) whether the statute was enacted for the benefit of a special class of which the plaintiff is a member; (2) whether there is any indication of legislative intent to create a private remedy; (3) whether such a remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether a federal remedy is inappropriate because the subject matter involves an area that is primarily of concern to the states. *Cannon v. University of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560; *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26. The Court determined in *Cort* that there was no private right of action for a derivative suit against corporate directors based upon alleged violation of federal criminal statutes prohibiting certain expenditures of corporate funds on behalf of political candidates largely because the criminal statutes were not enacted for benefit of shareholders. *Cort,* 422 U.S. at 81–82, 95 S.Ct. at 2089–2090. The majority of the Court in *Cannon* found a private right of action in Title IX of the Education Amendments of 1972 on the basis of all four *Cort* factors in the case of a petitioner who alleged that her applications for admission to medical school were denied because of her sex. The Supreme Court has repeatedly emphasized that the goal is to determine congressional intent, emphasizing the second and third of the four factors. See, *e.g., Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146; *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536, 104 S.Ct. 831, 838, 78 L.Ed.2d 645. Although this inquiry closely resembles the analysis courts use to determine whether a Section 1983 cause of action exists, the burden of demonstrating the existence of each factor lies with the plaintiff asserting the right as opposed to the defendant. *Boatowners,* 716 F.2d at 674; see also *Wilder,* 110 S.Ct. at 2517 n. 9; *id.* at 2526 (Rehnquist, C.J., dissenting).

The DCFS again asserts that nothing in the AAA supports the existence of any enforceable rights under the Act. The right asserted by plaintiffs, namely the right to have the DCFS exert "reasonable efforts" to prevent removal of the child from home and "reasonable efforts" to return the child to her home once removed, is unenforceable according to the DCFS for the same reasons that the right is supposedly unenforceable under Section 1983. The district court disagreed with the DCFS and found that such a right exists, citing *Cort v. Ash, supra, B.H. v. Johnson, supra,* and *Wolfe v. New Mexico Dep't of Human Services,* 575 F.Supp. 346, 353 (D.N.M.1983). In *B.H.,* Chief Judge Grady held that plaintiffs had an enforceable right under Section 1983 to the "case plan" and "case review" requirements found in Section 671(a)(16). Judge Shadur reasoned that to imply an enforceable right under Section 671(a)(16) but not under the subsections relied upon by the plaintiffs here, even though both provisions were contained in the Section outlining required plan features, would be inconsistent since both were conditions for the receipt of federal funds under the Act. *Artist M.,* 726 F.Supp. at 694–695.

The DCFS attempts to distinguish the right enunciated in Section 671(a)(16) from the rights set forth in Sections 671(a)(15) and 671(a)(9) by noting that the Act defines those rights and contains very specific guidelines for implementing the case plan and case review provisions. Yet there is no indication that Congress intended to create a single right to the exclusion of all other

alleged rights in an Act; Congress is not required to spell out all rights intended to be created by a federal law merely because it chooses to spell out one. Moreover, the Act's failure to provide a definition of each right is not fatal to plaintiffs' claims. *Wilder*, 110 S.Ct. at 2516, 2525 (failure of Congress to define "reasonable and adequate" did not preclude finding of substantive, enforceable right).

The district court's decisions in this case are not, as the DCFS argues, an invitation for these and future plaintiffs to use the AAA as a tool for federal court interference with all state decisionmaking with respect to its vast child welfare system. As the district court explains in its supplementary findings, under the current system as structured by the DCFS, the assignment of a caseworker is absolutely essential if the DCFS is to make even the first efforts, much less reasonable ones, to maintain the child's family ties, to work towards reunification of the family if appropriate, and to ensure the child's well-being. The district court's injunctive relief does not dictate a method of assigning caseworkers or interfere with the ability of caseworkers to exercise their own professional judgment on the job.[11] The court is not creating federally enforceable rights to beds, monetary assistance, or housing. The injunction merely fulfills the minimal requirement of the AAA that reasonable efforts are made toward the goals of reducing unnecessary foster care placement and family disruption, and it does so through a method designed to maximize DCFS decisionmaking.

The First Circuit made an analogous holding in *Lynch v. Dukakis*, 719 F.2d 504, 514 (1983). A class action suit filed on behalf of all children within the jurisdiction of the Massachusetts foster care system alleged in part that the requirements of 42 U.S.C. §§ 671(a)(16), 675(1), 675(5)(B), that the state develop a "case plan" for each child and periodically review the status of the plan could not be met because caseworkers were not promptly assigned to the children in the class. Just as the DCFS argues here that the prompt assignment of caseworkers is not a procedural right guaranteed by the AAA, the defendants in *Lynch* argued that the district court had exceeded its authority by requiring Massachusetts to assign all cases to a caseworker within 24 hours of receipt of a case. *Lynch*, 719 F.2d at 514. The First Circuit quoted with approval the logic of the district court's reasoning: " 'It is evident that when a case is not assigned to a social worker directly responsible for servicing the case, the case planning and periodic review mandated by Title IV–E will not be provided.' " *Id.* It is similarly evident here that when a child is not promptly assigned to a caseworker "reasonable efforts" are not being made, as Congress intended, to "lessen the emphasis on foster care placement and * * * encourage greater efforts to find permanent homes for children either by making it possible for them to return to their own families or by placing them in adoptive homes."

The Sixth Circuit cited *Lynch* favorably when presented with the suit of a mother seeking, through a Section 1983 action, to enjoin Kentucky social workers from depriving the mother of the "meaningful visitation" purportedly guaranteed by the AAA. *Scrivner v. Andrews*, 816 F.2d 261, 263 (1987). The *Scrivner* court affirmed dismissal of the suit, however, in part on the ground that it could not find such a visitation right in the AAA. Visitation rights are not involved in this case.[12]

---

11. The DCFS argues that in requiring the assignment of a caseworker within three days, the DCFS is deprived of the "flexibility" to make assignments at different rates of speed depending on the gravity of the case or the expertise required (Reply Br. at 23 n. 26). The gravamen of the district court's finding, however, is that for each and every member of the class the prompt assignment of a caseworker is a necessary first step toward the "reasonable efforts" required under the AAA. It is difficult to see how this minimal requirement hinders the DCFS in applying greater or lesser degrees of expertise to particular cases at any stage of the process.

12. A panel of the Fifth Circuit has also held that Louisiana officials were not entitled to a qualified immunity defense against a Section 1983 action alleging a series of violations of the AAA that would have amounted to "wholesale neglect" by the officials. *Del A. v. Edwards*, 855

■ Finally, a word is necessary regarding the claim by DCFS that even if other members of the class could maintain an action under the terms of the AAA, children living at home under Juvenile Court orders have no standing to sue. As Judge Shadur explained in analyzing the relevant provisions of the AAA, the language of that statute does not reveal an intention by Congress to limit its terms only to children actually in foster care outside the home, *Artist M.,* 726 F.Supp. at 695, and the DCFS fails to provide a compelling reason to read such a distinction into the statute.

### IV. Preliminary Injunction

■ Plaintiffs' complaint states a cause of action. That requires us to consider the grant of the preliminary injunction. The Court reviews the district court's factual determinations for clear error, Fed.R.Civ. Proc. 52(a), while the legal conclusions are reviewed *de novo. Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1181 (7th Cir.1989).

■ The district court correctly evaluated the request for injunctive relief in accordance with *Roland Machinery Co. v. Dresser, Industries,* 749 F.2d 380 (7th Cir. 1984). After hearing or reviewing extensive testimony, exhibits, and other submissions, the experienced and capable district judge found that plaintiffs introduced ample evidence to support their allegation that they were being deprived of the services to which they were entitled under Section 671(a)(15) as a result of the DCFS practice of not assigning a caseworker to them within a reasonable time period. Judge Shadur further found that the plan being implemented by DCFS to remedy the delay in this assignment still did not assure that caseworkers were assigned, and that without a caseworker many services would be denied members of the class. Accordingly, the court determined that plaintiffs had more than a reasonable likelihood of prevailing on the merits of their claim (App. at

7). A review of the evidentiary transcripts indicates that the district court's finding in this regard is correct. This finding is only reinforced by the further findings issued July 25, 1990, in which the court found that the DCFS has failed to restructure its programs in any effective way in response to its systematic violations of the AAA.

■ The district court further found that plaintiffs would suffer irreparable harm if the preliminary injunction did not issue. The facts established below indicated that the irreparable harm borne by plaintiffs as a result of the delay in assignment included an increased likelihood that families would be broken up or remain apart, that plaintiffs would be deprived of protective services, and that, in the absence of timely case plans and case reviews, children would be left in "unnecessarily restrictive or dangerous placements, denied * * * essential visits with their parents and place[d] * * * at risk of further injury" (App. at 5). Against these harms the court weighed the harms alleged by the DCFS. Those included adding an extra layer of bureaucracy to the already overburdened agency and diverting resources from other agency services in order to accommodate an increased number of caseworkers. The balance of harms clearly weighed, in the district court's analysis, in favor of a preliminary injunction.

A review of the findings indicates that the district court's determination that the balance of harms weighs heavily in plaintiffs' favor is not an abuse of discretion, especially in light of this Circuit's rule that monetary loss, here to the DCFS, does not constitute an irreparable injury. *Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.,* 841 F.2d 163, 164–165 (7th Cir.1988).

### V. Conclusion

In light of *Wilder v. Virginia Hosp. Ass'n,* 110 S.Ct. 2510, plaintiffs may maintain a cause of action under Section 1983 for alleged deprivations of their federal

F.2d 1148, 1153–1154 (1988). That decision, however, was vacated for a rehearing en banc, 862 F.2d 1107 (1988), and the appeal was subsequently dismissed without opinion when the plaintiffs voluntarily dismissed their damages claim, 867 F.2d 842 (1989).

statutory rights under the AAA. In addition, under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, plaintiffs may pursue a cause of action against the DCFS directly under the Act. Plaintiffs have established the propriety and justified the scope of the preliminary injunction.

The district court's orders denying the DCFS motion to dismiss and granting plaintiffs' motion for a preliminary injunction pending trial are affirmed. The affirmance includes the April 3, 1990, amendment to the preliminary injunction.[13]

MANION, Circuit Judge, dissenting.

The Illinois Department of Children and Family Services (the DCFS) may have one of the most difficult assignments in the state. The horror stories recited by the district court produce an almost irresistible desire for judicial intervention. Although the majority presents a compassionate argument supporting such intervention, I must respectfully dissent. Contrary to the court's holding, I believe that the "reasonable efforts" clause of § 671(a)(15) of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 620–628, § 670–679(a) (the "AAA"), is too ambiguous and indefinite to form a basis for a recognizable right and an enforceable obligation under the AAA or § 1983.

The district court and now this court have found that the AAA creates an individually enforceable right to "reasonable efforts" which, at this point, under the injunction invoked by the district court, means that a caseworker must be assigned to each child within three days after that child comes into the custody or under the protection of the DCFS. The majority cites the recent Supreme Court decision of *Wilder v. Virginia Hospital Association,* —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), as authority for establishing a child's right to "reasonable efforts" under the AAA. I respectfully disagree. *Wilder*'s holding relates to a statutory provision and facts discernably different from

that of the present situation. We should instead observe the more applicable legal standards and reasoning of *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), which generally discusses the circumstances in which enforceable rights are derived from a statute's language.

At the outset, I should add that I am not questioning whether an individual child injured by DCFS operations ever has a right of action under § 1983 and the AAA for violations of statutory or constitutional rights. For example, a foster child has a right to sue under § 1983 to enforce his due process right not to be placed with foster parents who the DCFS knows or suspects to be abusive. *K.H. v. Morgan,* 914 F.2d 846 (7th Cir.1990). The deliberate indifference in the placement of siblings, *Aristotle P. v. Johnson,* 721 F.Supp. 1002 (N.D.Ill.1989) or the placement of children in homes which detrimentally affect a child's emotional and physical well-being, *B.H. v. Johnson,* 715 F.Supp. 1387 (N.D.Ill. 1989), provide grounds for suit under § 1983 to remedy alleged constitutional violations. But the "reasonable efforts" language in the AAA which promotes keeping a child in his home or returning him to his home presents no constitutional guarantees, nor does it create any private statutory rights as established by the Supreme Court, see *Pennhurst, supra,* and *Wright v. Roanoke Development and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). I therefore conclude that the "reasonable efforts" clause of the AAA does not establish any substantive rights enforceable under the AAA itself or through § 1983.

I.

Section 1983 permits individual legal action for violations by State agents of federal "rights, privileges, or immunities." This remedy is not available for simple violations of federal law. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555

---

**13.** The Court appreciates the views presented by the *amici* American Civil Liberties Union, *et al.,* and the *amici* Joann Mitchell, *et al.*

(1980). To establish a federal right, a statute must create an obligation binding on the governmental unit. The law must do "more than express a congressional preference for certain kinds of treatment." *Pennhurst*, 451 U.S. at 19, 101 S.Ct. at 1541. The interest the plaintiff asserts must not be "too vague and amorphous" to be "beyond the competence of the judiciary to enforce." *Wright*, 479 U.S. at 431–32, 107 S.Ct. at 775.

The majority concludes *Wilder* supports plaintiff's action under § 1983. In *Wilder* the plaintiff hospital association questioned the "reasonableness" of reimbursement rates established by a state to compensate health-care providers for rendering medical services under the amended Medicaid Act, 42 U.S.C. § 1396. The Court examined a provision of the Medicaid Act (the Boren Amendment) which obligated the states, as a condition for receiving federal financial assistance, to adopt "reasonable and adequate" reimbursement rates for health-care providers rendering services under the Act. The Boren Amendment further stipulated that such "reasonable and adequate" reimbursement rates were to meet the costs of "efficiently and economically operated [medical] facilities." The defendant State resisted the suit claiming that the Boren Amendment did not create rights for health care providers and that the "reasonable and adequate" standard was vague and thus beyond the competence of the court to interpret.

The Court in *Wilder* permitted the health care providers' suit based largely on its findings that (a) the Boren Amendment imposed a binding obligation on the states participating in the Medicaid program to adopt reasonable and adequate rates for the benefit of health-care providers, and (b) the obligation of the state to adopt rates that are reasonable and adequate was not too vague and amorphous to be judicially enforceable. The Court thus affirmed the principle that a State's denial of its own clearly annunciated obligations provides grounds under § 1983 for action by the intended beneficiaries.

In *Wright v. City of Roanoke Redevelopment & Housing Authority, supra,* which the *Wilder* Court explicitly followed, tenants in low-income housing claimed they were overbilled for utilities in violation of rent ceilings imposed by the Brooke Amendment to the Housing Act of 1937,[1] and its regulations. The Court concluded the statute and regulations did create rights as derived from identifiable obligations of the states which were enforceable under § 1983. The Brooke Amendment limits the amount of rent a public housing tenant can be charged, and regulations adopted pursuant to the statute require inclusion of a "reasonable" allowance for utilities in the rent. 479 U.S. at 430, 107 S.Ct. at 774. The Court reasoned that both the statute and the regulations were "mandatory limitation[s] focusing on the individual family and its income." *Id.* at 430, 107 S.Ct. at 774. Additionally, the Court rejected the argument that the provision for a "reasonable" utility allotment was too vague to create an enforceable right. Because the regulations set out guidelines for the housing authorities to follow in determining the utility allowance, the right was "sufficiently specific and definite to qualify as [an] enforceable righ[t] under *Pennhurst* and § 1983 [and was] not ... beyond the competence of the judiciary to enforce." *Id.* at 432, 107 S.Ct. at 775.

In both *Wilder* and *Wright,* the Court gave substance to a statutorily designated standard of "reasonableness" in § 1983 actions. *Wilder* interpreted and enforced "reasonable" rates, *Wright* interpreted and enforced "reasonable" allowances for utility payments. However, the judicial treatment of the "reasonableness" language found in *Wilder* and *Wright* should have no bearing on this case. Under the statutory language in *Wilder,* the court need only recognize the requirement of the states to establish "reasonable and adequate" reimbursement rates. This requires little more than a comparison of the State's established rates for medical services to those customarily charged by health care providers for the same or similar

---

1. 42 U.S.C. § 1437a.

treatment. A federal judge under this statutory scheme can easily discern whether the state's proposed rates were out of line. Likewise, a court has total competence to determine the reasonableness of utility allowances by comparing them to local utility rates.

Both the *Wilder* and *Wright* Courts construed the reasonableness of specific governmental requirements. The disputed "reasonable efforts" clause of the AAA allows no such precision. The "reasonable efforts" clause creates no specific mandate to the DCFS. Therefore there is nothing for the court to determine as being reasonable or unreasonable. Rather than concentrating on the "reasonableness" of a particular governmental activity, § 671(a)(15) relates to the overall reasonableness of every aspect of the foster care program. This significantly distinguishes the present case from *Wilder* and *Wright.* Indeed, it is not at all apparent from reading § 671(a)(15) what precisely are the states' obligations under the AAA, and what enforceable rights have been established for the AAA's beneficiaries. A state's duty to exert "reasonable efforts" in general does not suggest any particular obligation. In contrast, a court can easily determine and enforce a state's obligation to establish "reasonable" reimbursement rates, or provide for "reasonable" utility allowances when setting public housing rents.

Additionally, this court insists that *Wilder* categorically rejects the argument that "reasonable" and "adequate" are vague and unenforceable and concludes the courts are capable of determining whether a state is exerting "reasonable efforts." (*Ante*, pp. 986–987, and 989) What *Wilder* actually says, however, is that a standard like reasonableness is not vague or unenforceable when judged "against an objective benchmark of an 'efficiently and economically operated facility' ..." 110 S.Ct. at 2523. Similarly in *Wright*, the Court felt competent to enforce the "reasonable" allowance standard only with reference to the objective benchmark of "the individual family and its income." Both "benchmarks" provide a basis for a relatively simple judicial calculation. But in the present case, the

AAA provides no such objective benchmark. Rather, the Act gives a general directive that is much too broad to give a federal judge a proper gauge from which to measure reasonable efforts.

In *Pennhurst*, the Court explored the problem of using ambiguous statutory language to establish state obligations and beneficiary rights. The Supreme Court held in *Pennhurst* that § 6010 of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.* (the "DDA"), did not create rights enforceable under § 1983 or under the DDA. The plaintiffs in the case, mentally retarded patients at a state hospital, brought suit challenging the conditions of their confinement. Plaintiffs claimed that the treatment they actually received conflicted with provisions conditioning the receipt and availability of federal funds upon state efforts to provide patients with "appropriate treatment" in the least restrictive manner. Since Pennsylvania received money under the DDA, plaintiffs filed suit under § 1983 claiming a violation of their statutory right to "appropriate treatment." The Court found the language "appropriate treatment" and "least restrictive" setting to be "largely indeterminate" and "too thin a reed" to support a creation of rights and obligations on the states. 451 U.S. at 19, 101 S.Ct. at 1541. "It is difficult to know what is meant by providing 'appropriate treatment' in the 'least restrictive' setting, and it is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment." *Id.* at 24–25, 101 S.Ct. at 1543–44.

The Court also specified under what conditions statutory language would create substantive rights and obligations. "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Id.* at 24, 101 S.Ct. at 1543. The Court analogized: "Legislation enacted pursuant to the spending power," such as the AAA, "is much in the nature of a contract ... in return for federal funds,

the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract', ... [t]here can ... be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* at 17, 101 S.Ct. at 1540.

The crucial inquiry, therefore, is "not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice." *Id.* at 25, 101 S.Ct. at 1544. The Court found that the statutory language in *Pennhurst* fell well short of providing clear notice to the State that they, by accepting the funds under the Act, would be obligated to provide "adequate treatment" as imagined by the plaintiffs. "[It] strains credulity to argue that participating States should have known of their 'obligations' under" the "adequate treatment" provision. *Id.*

As with the language in *Pennhurst,* the phrase "reasonable efforts" does not communicate or prescribe any specific set of practices which unambiguously notify Illinois of the conditions it must meet in order to receive federal help. "Reasonable efforts" is an indeterminate statement, to say the least. Rather than being a specific mandate with explicitly detailed directives, § 671 merely encourages the state to set up a plan that outlines the state's proposed method to care for distressed children requiring removal or supervision by the DCFS. Subsection (a)(15) directs the plan to include provisions that *"in each case, reasonable efforts will be made...."* Since every case will be different, "reasonable efforts" cannot be expected to be the same. The vagueness of "reasonable efforts" cannot create binding obligations and rights. Without proper congressional guidance we should refrain from inventing rights which interfere with the foster care system. The successful administration of the system requires substantial expertise and familiarity from its operating personnel and the juvenile courts that oversee each case. It is clear from its plain language that § 671(a)(15) is fashioned to give broad discretion to such child welfare professionals to determine what efforts are reasonable in each situation. Therefore, the courts should not intervene unless the system becomes violative of a child's constitutional rights or rights clearly established by statute.

## II.

I conclude where this argument began—with the plaintiffs' complaint that the DCFS does not assign caseworkers quickly enough to meet the standards of the AAA once a child becomes a ward of the juvenile court under the supervision of the DCFS. I agree with this court that the AAA was designed to provide "incentives to encourage a more active and systematic monitoring of children in the foster care system." (*Ante,* p. 985 citing *State of Vermont Dept. of Social & Rehab. Srvs. v. United States Dept. of Health & Human Srvs.,* 798 F.2d 57, 59 (2d Cir.1986). Incentives in this case do not create rights and binding obligations. A State's failure to perform under a Plan is remedied by Congress' foreclosing federal funding. That may be the only practical alternative under the AAA. Federal courts cannot properly supervise every aspect of the DCFS operation, something they now may be expected to do given this opinion.

The magnitude of the court's assumed obligation is apparent under the terms of the district court's injunction. The district court enjoined defendant from:

(a) Failing to assign a caseworker *capable* of providing child welfare services to each of the plaintiffs and their families within three working days of the time that plaintiffs' cases are first heard in juvenile court; and

(b) Failing to assign a caseworker *capable* of delivering child welfare services within three working days of the time that a previously assigned caseworker

relinquishes responsibility for any portion of a case.

(Emphasis added.)

The injunction refers to a caseworker "capable" of providing child welfare services. So, in addition to constructing "reasonable efforts" the court must construct the meaning of "capable" under the injunction. The injunction is not clear whether a caseworker "capable" of providing services is one who has the specialized training and ability, or who simply has the time to perform the services. One would hope both, but given the constraints on the system, that may be too much to hope for. The district court has already frowned upon *en masse* assignment of many cases to one caseworker, presumably even if done in three days.[2] The only solution may be very expensive (i.e., hiring and training many more caseworkers).

The right that we have created in this opinion will allow every child, by his next friend, to challenge the reasonable efforts of the caseworker. If the DCFS, through the recommendation and services of the caseworker, determines that the child should be placed in a foster home, the child's advocate could disagree and challenge the decision in federal court because, in his opinion, the "reasonable efforts" were unreasonable. The same goes for a child who is not put in a foster home, or for the child who is put in a foster home that for some reason (obviously other than his continued exposure to abuse, neglect, or exposure to physical or emotional trauma) is not to his liking.

We are confronted with a tragic class of people—children of alcohol and drug addicts, children victimized by severe domestic violence, children who are abused in unimaginable ways, children who are malnourished, sick and neglected. The district court's order requires that a caseworker be assigned in three days. But if the caseworker, even though assigned, is not meeting someone's definition of reasonable efforts, the district judge will again be petitioned to intervene. With this court's approval of the district court's finding that each of these children have an individual enforceable right to challenge the reasonable efforts of the DCFS, we can anticipate an avalanche of lawsuits seeking to obtain specific social services and mandatory injunctions governing every imaginable detail over the operation of the DCFS. Clearly this is far beyond the intent of Congress.

This opinion moves the court from its proper role as impartial arbiter of cases and controversies under the law to that of a crisis administrator of child welfare. Ironically, this decision, while attempting to advance the well-being of abused children, may instead result in the delay or denial of benefits. Delay and denial will result because standing for injunctive and declaratory relief has now been extended to every plaintiff with a notion of "reasonable efforts" that conflicts with that of the DCFS. The DCFS will most likely experience considerable paralysis because any efforts deemed unreasonable by scrutinizing plaintiffs and courts could cease, resulting in no remedial efforts while litigation continues in situations where something must be done.

Until Congress specifies certain individual rights under the AAA, this court should confine § 1983 actions against the DCFS to alleged constitutional violations such as those in *K.H. v. Morgan, supra, B.H. v. Johnson, supra,* and *Aristotle P. v. John-*

---

**2.** In an earlier disposition of this case, when this court entered a partial remand requesting the district court to enter factual findings concerning the current delays in caseworker assignment and reassignment, the district court, after a hearing, submitted a comprehensive set of findings. On the whole, these findings set out a complex set of problems and deficiencies related to the operation of the DCFS. These findings addressed the situation which existed as of March 2, 1990, the time the injunction was issued. The district court's finding 27 notes:

"Cases that *were* reassigned during a caseworker's absence were reassigned en masse to a single caseworker, who by the nature and volume of the reassignments was not and could not be expected to provide services." From this it is difficult to see how the injunction is going to assist the overloaded caseworker and his already unmanageable workload. One wonders how the court must consider Finding 27 if a later dispute should emerge on whether such a caseworker is "capable" under the terms of the injunction.

*son, supra,* and otherwise stay out of what is now a reasonably streamlined and publicly accountable chain of command in the distribution of child welfare and assistance benefits. I would reverse the district court.